## CONSOLIDATED FLOUR MILLS CO. v. MUEGGE.

### SAME v. PORTER (two cases).

Nos. 16959. 16960 and 16961, Consolidated. Opinion Filed Sept. 13. 1927.

Rehearing Denied Nov. 8. 1927.

(Syllabus.)

**1. Corporations—Foreign Corporation "Doing Business in State"—Amenability to Process of State Courts.**

Where a foreign corporation constructs and operates a grain elevator in this state, for the purpose of buying or storing wheat, and has an agent or person in charge of such elevator, who purchases wheat either conditionally or unconditionally, apparently in the same manner as if it were a domestic corporation, and ships all of the wheat purchased to a foreign state. to be milled or manufactured into the finished product, held, that such constitutes "doing business in this state," and such foreign corporation is thereby amenable to the ordinary process of the courts of Oklahoma; and the fact that the business carried on is entirely interstate in its character does not in any manner affect the case.

**2. Same—Presumption as to Authority of Agent Having Management of Business.**

Where a person imposes upon another the duties and responsibilities involving the management and control of a business, such person will be presumed to have authority to represent his employer in any matter within the scope of the business; and this rule applies peculiarly to corporations which act only through their officers and agents.

**3. Pleading—Determination Whether Claim for Damages Based on Contract or Tort.**

To determine whether a claim for damages is based upon contract or tort, it is proper to examine the pleadings and ascertain from the allegations and prayer thereof the relief sought, and every doubt will be resolved in favor of the contract and against the tort. (Stringer v. Kessler, 56 Okla. 50. 155 Pac. 867.)

**4. Courts—District Courts—Counties as Units—Existing Term of Court not Affected by Statute Attaching County to Another District.**

Under our law, section 9, art. 7 of the Constitution, and legislative enactments pursuant thereto. district courts exist as district courts of a particular county, and not as district courts of a particular judicial district; and where by an act of the Legislature a county is detached from one judicial district and attached to another district. and the terms of court are not changed by law, such legislative act does not disturb any lawful term of the court in existence at the time such law becomes effective.

Commissioners' Opinion. Division No. 1.

Error from District Court, Grant County; James B. Cullison, Judge.

Consolidated actions by A. Muegge, M. F. Porter, and D. N. Porter, against the Consolidated Flour Mills Company, for recovery of the market value of certain wheat which defendant received from plaintiffs under implied contracts of purchase. Judgment for plaintiffs, and defendant brings error. Affirmed.

Beeching & Burnett. Charles Hall, J. E. Falkenberg, and Lydick & McPherren, for plaintiff in error.

J. B. Drennan and Sam P. Ridings, for defendants in error.

HALL, C. The plaintiff in error in these cases was defendant in the court below, and the defendants in error were plaintiffs. For convenience they will be referred to in this opinion as they appeared in the trial court. Occasionally, herein the defendant will be referred to as "company."

Briefly the facts are as follows: The defendant was and is a foreign corporation incorporated under the laws of the state of Kansas, with its principal offices at Hutchinson in that state. The defendant was the owner and operator of an extensive chain of flour mills located in that state. It was also the owner of a number of grain elevators which it operated in connection with its mills for the manufacture of flour and by-products of wheat. Two of these elevators were located in the state of Oklahoma, one at the town of Numa and the other at the town of Lamont. These actions grew out of transactions with defendant at its elevator in the town of Lamont, The defendant owned and operated the grain elevator at Lamont from April, 1920, to the latter part of August, 1923. The

company's agent or managing officer or person in charge of its business in connection with the elevator at Lamont was one A. M. Boyer, who was such manager or agent during the entire period of its operations in this state. Boyer, as such agent and manager for the company, the defendant herein, acted within the scope of the company's business, purchased for it wheat from the farmers residing in the community or surrounding country about Lamont, and paid for this wheat so purchased with the company's checks or bills in the form of sight drafts to the defendant company, payable through some designated bank at its general offices at Hutchinson, Kan.

It was the practice of the company, and its system of doing business, to receive wheat in wagon loads, weigh and grade same and issue to the seller what was called a "scale ticket." Often the seller of the wheat would desire the immediate payment for that particular load of wheat and in such case Boyer, as such company's manager, would issue to the seller the company's sight drafts as stated above, or what the company designated on the scale ticket as a "check." More often, however, during these three years of operation by this company at Lamont, the farmers would haul their wheat to the elevator and Boyer would weigh and grade same in the regular manner, dump the wheat into the elevator bins and issue the scale tickets to the seller. Then the seller would keep these scale tickets, several in number in many instances, and when he needed or desired the money he would bring in to the elevator all of his scale tickets and Boyer would issue to the seller a check or draft for the sum total. One of the plaintiffs in this action, to wit, A. Muegge, had 13 separate and distinct scale tickets outstanding at the time Boyer became involved in the clutches of the law with his company, the defendant herein. The company refused to pay for the wheat represented by these scale tickets.

The defendant, while operating at Lamont in this state, purchased about 100,000 bushels of wheat. In all these purchases, and all its business at its elevator there, was done and transacted by and through Boyer, the company's manager and agent. The defendant company actually received at its mills in Kansas every bushel of the 100,000 bushels of wheat purchased by Boyer at Lamont from these plaintiffs and others. The sellers of this wheat received payment for approximately 88,000 bushels. 12,000 bushels, a considerable portion of which was sold or placed in the company's elevator by plaintiffs in these actions, has never been paid for by defendant or any other person. The defendant claims, which is undoubtedly correct, that its manager, Boyer, through fraud and a distortion of the books and records of the company, got payment, himself, for plaintiff's wheat, the amount of which is the amount in controversy in these cases, and appropriated the same to his own use and benefit.

It appears that this man Boyer, at various times, embracing a short period of time before his malfeasances were discovered by his principal, the defendant, had made out scale tickets to himself, representing certain loads or quantities of wheat he had purchased for the company, and had sent these forged scale tickets and duplicates to the company and had drawn sight drafts on the company payable to himself, and thereby was enabled by such fraudulent methods to get payment for this 12,000 bushels of wheat which these outstanding scale tickets represented. In some cases he would issue the seller scale tickets written on the company's letterheads, and often on blank paper. He was enabled to defraud the company to such a considerable extent by the fact, as aforesaid, that it was the practice and custom of the company and of the farmers to haul in their wheat to the elevator, get a scale ticket for each load and often wait until the end of the season before bringing in these scale tickets to receive from Boyer the company's check or draft for the entire amount. This, of course, was optional with the seller. If he wanted the money for each load, the company through Boyer would pay him "cash on delivery" of the wheat. Either course was the company's approved method. Up to the time that Boyer's misconduct was discovered, which was just prior to the company's withdrawal from the state, this defendant company, being a large and responsible concern, had and deserved the confidence of the entire people of that community; and they of course felt perfectly safe in holding and retaining their scale tickets until they needed the money from the sale of their wheat. They had done so for two preceding years without any disastrous or unpleasant effects.

In addition, it appears that the defendant sold feedstuffs at retail from its elevator. However, this decision will be based upon broader ground. The fact of its sale of feedstuffs at retail may be entirely disregarded. The defendant company leased the land on which the elevator was built, built

the elevator, and was the owner of it and all the machinery connected therewith. This property, elevator, and the amount of wheat therein on the first of January of each year, was assessed for taxation.

As soon as this misconduct of Boyer was discovered by the company, Boyer was immediately discharged; and the plaintiffs within a short period of time presented these scale tickets to the company for payment. But instead of paying for this wheat, it immediately sold or made a transfer of its property, to wit, its elevators at Numa and Lamont, and withdrew from the state.

The defendant had not obtained authority to do business in the state of Oklahoma, and had not designated an agent upon whom service of process could be made.

The plaintiff commenced these actions in the district court of Grant county, the proper forum, and service of process upon the defendant was obtained by service of summons upon the Secretary of State.

The defendant appeared specially upon a motion to quash the summons, and raised this jurisdictional question at every step of the proceedings throughout the trial. The other pertinent facts relative to the case will be stated hereafter in the opinion.

Defendant first contends that it was not doing business in this state at the time the action was brought or at the time of the service of summons. In reality it contends that it never was engaged in doing business in the state of Oklahoma.

Counsel for defendant in their original, supplemental, and reply briefs have cited numerous cases in support of the above contention. Many of the cases cited relate strictly to an interference by a state with interstate commerce. These cases are not in point. As we understand the law, the commerce clause of the federal Constitution is in no wise involved in this controversy. It is conceded that a state cannot lay a burden upon interstate commerce. But it is the universally accepted rule and doctrine that subjecting a nonresident corporation or nonresident natural persons to a given jurisdiction for the purpose of rendering against either a judgment in personam, does not interfere with or violate the interstate commerce clause of the federal Constitution. If the rule were otherwise, for example, a corporation such as a trunk line or interstate railroad would be immune from process issued out of the courts of any of the states—on the theory that to permit an action to be maintained against

it might, and occasionally would, seriously impair its ability to efficiently perform the duties of an interstate commerce carrier, or to transport commodities between the states.

The question to be determined in this case, as well as all cases of like character, is whether or not a foreign corporation, through its agent, was doing business within this state, to such an extent as to warrant the state in subjecting it to the jurisdiction of our courts. The rule rests upon the general principle applicable to all nonresident defendants, whether natural or artificial persons. The rule is that jurisdiction to render a personal judgment cannot be acquired by constructive or substituted service except by express or **implied consent;** and that this right is protected by the "due process" clause or 14th Amendment to the federal Constitution. But, as stated in a well-known text, Ruling Case Law, vol. 21, page 1341:

"It is an obvious corollary of the proposition on which the rule rests, viz., that the corporation, by doing business within the state, **impliedly consents to the condition that it shall be subject to suit therein.**" (Emphasis ours.)

In other words, the application of the doctrine to foreign corporations is but a specific application of the general rule and not an exception to it.

There is contained in one or two judicial opinions some remarks that the unwarranted subjection of a foreign corporation to the jurisdiction of the courts of a given state would be laying a burden upon interstate commerce; but further than these isolated expressions, that matter has not been taken seriously by the profession; and it may be safely said, following the Supreme Court of the United States, that:

"The fact that the business carried on by a corporation is entirely interstate in its character does not render the corporation immune from the ordinary process of the courts of the state." International Harvester Company v. Kentucky, 234 U. S. 579.

The term "doing business" by a foreign corporation in a state, in such a manner as to subject it to process of the courts, either state or federal, of that particular jurisdiction is incapable of a satisfactory definition. The application of the rule or principle to any given case is by the process of inclusion and exclusion derived from the numerous decisions of the federal Supreme Court. Each case must be determined by its own particular facts.

Considering the facts in this particular

case, in reaching the correct conclusion, much of the apparent difficulty is removed by reference to, and a consideration of the well-established doctrine and rule set forth by the Supreme Court of the United States defining in general terms what is necessary to give a court jurisdiction to render a judgment in personam against a foreign corporation:

"'First, it must appear that the corporation was carrying on its business in the state where process was served on its agent; second, that the business was transacted or managed by some agent or officer appointed by or representing the corporation in such state; third, the existence of some local law making such corporation amenable to suit.' Connecticut Mut. L. Ins. Co. v. Spratley, 172 U. S. 602, 43 L. Ed. 569. 19 S. Ct. Rep. 308, quoting United States v. American Bell Telephone Co. (C. C.) · 29 Fed. 17."

In connection with the first requirement that the corporation must be doing business in the state, this writer is unable to conceive of a state of facts presenting a clearer case or one more pronounced or more capable of being determined in the affirmative without serious question, than the present case.

This foreign corporation not only had a resident agent in this state for the purpose of buying, paying for, and shipping raw commodities to it to be manufactured into the finished product, but was the owner and operator of a grain elevator in which local farmers could store their grain upon conditional contracts of sale whereby they would be given the advantage of a possible advance in the market price. This writer is inclined to the view that the inhabitants of Lamont thought the defendant had brought to their community quite an industrial and commercial enterprise, which was probably true and perhaps the largest enterprise in that entire community.

It would serve no useful purpose to enter into an extended discussion of the legal phase of this subject, paraphrasing and quoting from the numerous decisions of both the state and federal courts as to what constitutes "doing business" within a state. The decisions bearing upon the question are available and familiar to the profession. The matter is controlled by a long line of decisions of the federal Supreme Court, by which decisions we are bound, as the matter before us is one going to the question of the rights of a citizen under the 14th Amendment to the federal Constitution. We know of no case which, upon the principle announced and the specific facts involved therein, would entitle plaintiff in error to any relief. The question does not approach anywhere near the border line. That the plaintiff in error was doing business in the state of Oklahoma, within the clear purview of the subject-matter before us, is beyond any reasonable doubt.

In reaching this conclusion we have given special consideration to the cases of International Harvester Company of American v. Kentucky, 234 U. S. 579, 34 S. Ct. 944, 58 L. Ed. 1479; St. Louis Southwestern R. Co. v. Alexander, 227 U. S. 218, 33 S. Ct. 245, 57 L. Ed. 486, Ann. Cas. 1915 B, 77; and also W. J. Armstrong Co. v. N. Y. Cent. & H. R. R. Co., 129 Minn. 104, 151 N. W. 917, L. R. A. 1916E, 232, Ann. Cas. 1916 E, 335. In the case of International Harvester Co., supra, it is held that:

"It is essential to the rendition of a personal judgment against a corporation that it be doing business within the state; but each case must depend upon its own facts to show that this essential requirement of jurisdiction exists.

"The presence of a corporation within a state necessary to the service of process is shown when it appears that the corporation is there carrying on business in such sense as to manifest its presence within the state, although the business may be entirely interstate in its character.

"The fact that the business carried on by a corporation is entirely interstate in its character does not render the corporation immune from the ordinary process of the courts of the state."

In the St. Louis Southwestern Railway Company Case, supra, the court held:

"Where a railroad company establishes an office in a foreign district and its agents there attend to claims presented for settlement, as was done in this case, it is carrying on business to such an extent as to render it amenable to process under the law of that state.

"Service of process on a resident director of a foreign corporation actually doing business in the state of New York is sufficient to give the court jurisdiction of the corporation."

As to decisions of state courts, which, of course, are secondary authorities on this particular question, we have given consideration and approval to the cases of Title Guaranty & Surety Co. v. Slinker. 42 Okla. 811, 143 Pac. 41. and John Deere Plow Co. v. Wyland et al. (Kan.) 76 Pac. 863.

The second requirement, that the business of the foreign corporation must have been transacted or managed by some agent or offi-

cer appointed in this state, we need not discuss. Boyer, who was in charge of defendant's business institution in this state, was unquestionably and admittedly the managing agent and employe of this foreign corporation. the defendant in these actions.

The third requirement is embodied in our law in section 5442, Compiled Oklahoma Statutes 1921.

Another point raised by plaintiff in error is the legality of the service of summons upon the Secretary of State in these cases. Plaintiff in error contends that the service is void for two reasons: First, that our statute, section 5442. supra, is violative of the "due process clause" of the federal Constitution. This court in several cases has held that this character of service is sufficient and that said section 5442, supra, does not violate the 14th Amendment to the federal Constitution. Title Guaranty & Surety Co. v. Slinker, supra; Kaw Boiler Works v. Frymyer, 105 Okla. 7, 231 Pac. 1059, and cases therein cited. These decisions, on principle, conform to the rule announced in the case of St. Mary's Franco-American Petroleum Co. v. West Virginia. 203 U. S. 183, 27 S. Ct. 132, 51 L. Ed. 144.

The rule, perhaps, is based upon the principle that where a state by statute designates an agent of a particular character, or an officer, or other person upon whom process may be served in an action against a foreign corporation, the corporation by sending such an agent into the state or coming into the state under such an existing law, and for the purpose of doing business within the state, assents to the statute, and impliedly, at least, clothes its agent or officer designated for that purpose with authority to receive service in its behalf. Baltimore & Ohio Ry. Co. v. Harris, 12 Wall. 65. 81 (20 L. Ed. 354); New York, L. E. & W. R. Co. v. Estill, 147 U. S. 591 (37 L. Ed. 292) 13 S. Ct. Rep. 444; Com. Mut. Acci. Co. v. Davis, 213 U. S. 245 (53 L. Ed. 782) 29 S. Ct. Rep. 445.

It is further contended that by reason of the fact that this corporation, the defendant, had quit the state, sold all its property herein, and revoked its working agency here (had him put in the penitentiary, and perhaps properly so), the service of the process on the Secretary of State is null and void. In this connection it will be observed that these causes of action arose while defendant was doing business in this state. It had never designated a person upon whom service could be made. We do not think the law is so treacherous as to permit a foreign corporation to escape liability for acts committed, or contracts breached, or obligations incurred during the time it was in active operation in a particular state by simply disposing of its property and withdrawing therefrom. The rule announced by the federal Supreme Court in the cases of Mutual Reserve Life Insurance Co. v. Birch, 200 U. S. 612, 26 S. Ct. 752, 50 L. Ed. 620; and Hunter v. Mutual Reserve Life Insurance Co., 218 U. S. 573, 31 S. Ct. 127, 54 L. Ed. 1155, 30 L. R. A. (N. S.) 686. is against the contention of defendant. These cases, together with numerous cases from various state courts, hold that the fact that the corporation later wihdraws from the state before the service of process does not affect their liability to be subjected to suit in the particular given jurisdiction when the cause of action arises while the corporation is engaged in business in the state. And in Meixell v. American Motor Car Sales Co., 181 Ind. 153, 103 N. E. 1071, Ann. Cas. 1916 B, 375, it was held that it is immaterial whether the appointee for service is a state officer or a private person. A very apt and brief discussion of this point was made by the Supreme Court of Iowa in the recent case of McClamroch v. Southern Surety Co., 193 Iowa, 249, in which it was said:

"It is not the spirit of the law to permit a corporation having a process-agent in a foreign jurisdiction to make contracts in that jurisdiction, and by withdrawing therefrom or by having its authorty revoked, compel parties litigant to seek the courts of the corporate domicile for the enforcement of claims or rights arising antecedent to the revocation or withdrawal. The appointment or recognition of a process-agent, whether an individual, commissioner or other officer, is upon the consideration that the foreign corporation shall have the right to carry on its business in that jurisdiction, and for the protection of those who deal with such corporation within that jurisdiction. In a sense it is a contractual relation, and may be viewed as an agency coupled with an interest."

The second proposition advanced by defendant relates to the question of the agency of their man, Boyer, who had charge of and was general manager of the company's grain elevator and business in the town of Lamont in this state. Their contention is that Boyer had no express authority to make the contracts or agreements which plaintiffs seek to enforce.

This particular question is controlled by numerous decisions of this court, viz., Continental Supply Co. v. Sinclair Oil & Gas Co., 109 Okla. 178, 235 Pac. 471; Daniel v.

Pappas, 93 Okla. 165, 220 Pac. 335; and Midland Savings and Loan Co. v. Sutton, 30 Okla. 448, 120 Pac. 1007. The rule directly applicable to this case is clearly stated by the Supreme Court of Georgia in the case of Pickens Co. v. Thomas, 152 Ga. 648, 111 S. E. 27, 21 A. L. R. 1438, as follows:

"If a person imposes upon another the duties and responsibilities involving the management and control of a business, **such person will be presumed to have authority to represent his employer in any matter within the scope of the business; and this rule applies peculiarly to corporations which act only through their officers and agents.**" (Emphasis ours.)

This language, on this point, expressing the rule has been approved by this court in the case of Continental Supply Co. v. Sinclair Oil & Gas Co., supra.

The same rule, expressed in somewhat different language, is stated by Thompson in his work on Corporations (2nd Ed.) sec. 1575.

In this connection the universal rule is that the principal will not be permitted to prove that the agent's authority was in fact less extensive than that with which **he apparently was clothed,** unless the principal can first show that the actual instructions to the agent were known to the other party or person dealing with the agent. Garfield, etc., Coal Co. v. Rockfort Line Co., 184 Mass. 60, 67 N. E. 863, 100 A. S. R. 543, 61 L. R. A. 946; Daniel v. Pappas, supra; Halley v. Brooks, 209 Ala. 486, 96 So. 341; Bernard Gloekler Co. v. Westbrook Hotel Co. (Tex. Civ. App.) 258 S. W. 870; 2 C. J. 566, section 209.

The fact that the company's agent, Boyer, issued to those farmers, plaintiffs in these cases, scale tickets or receipts or contracts, or whatever they might be termed, specifying the amount and grade and price of wheat, determined then or to be determined later, was within the apparent scope of authority of this said agent, and any secret agreement between the defendant and the agent, that only their special printed blanks should be used, instead of plain or white paper, would in no manner affect the company's liability for its agent's acts in performing the functions out of which these causes of action grew. This probably would be true even if the plaintiffs knew that the agent had received specific instructions to write the scale tickets on blanks furnished by the company, instead of writing them on white paper.

There is no merit in the contention of de-

fendant when viewed from either angle. It is sufficient to say, however, in this connection, that no attempt was made to make known to the farmers any knowledge of any special system of bookkeeping which the agent Boyer was instructed to follow in pursuit of the company's business, or the business in which it was engaged at Lamont, Okla.

The learned counsel for defendant, apparently with considerable seriousness, devote several pages of their original and reply briefs in arguing the contention that the agency of Boyer failed of proof, or in other words, that the evidence failed to show that Boyer was the agent of defendant. It is enough to say, in this connection, that every witness who testified, and there were many, testified positively to a book of facts showing that Boyer was the agent and manager of the defendant's business, its grain elevator, and at all times was in charge of its affairs while it operated at Lamont, Okla. This evidence is so cumulative as to become burdensome.

Not only did these witnesses testify that Boyer was the sole agent and manager of defendant's business establishment at Lamont, but they gave facts ranging over a period of three years to conclusively show the fact of agency. For instance, the railway agent testified that every car of wheat at that elevator establishment which was shipped out of Lamont was accompanied by a bill of lading showing the Consolidated Flour Mills Company as shipper, or consignor, and signed by said company, "by A. M. Boyer, its agent."

Independent of this evidence, counsel for defendant at various times during the progress of the trial, and especially in his opening statement to the jury, formally admitted that Boyer was their agent. All during the trial, the position they took and the questions they asked assumed that Boyer was their agent and manager of the company's elevator at Lamont.

The merit of their contention in this connection is well summarized by the trial court in his findings of fact as follows:

"* * * But in the case at bar I say to you without any hesitancy, that I would with clear conscience—maybe not with good judgment in your opinion—have held that this man Boyer was your agent, the agent of the defendant company, upon your own testimony. I will just eliminate all of the testimony of plaintiff and take the testimony of the defendant alone. I thought to myself when you were putting on your testimony, that that was as clear a case in the estab-

lishment of agency as I have had in my court.

"Mr. Beeching: May I now interrupt Your Honor for a moment, to say that we do not contend that he was not the agent of the company. We do contend that he had no authority in this instance."

It is next contended by defendant that this case should be reversed because the petitions of plaintiffs can be construed as stating a cause of action in tort for conversion, and that the proof showed perhaps a right of action ex contractu.

The petitions show that the causes of action arose part from contract and part from tort, or a tort coincident with a contract. Disregarding the measure of damages and the prayer for relief, the allegations in each of the petitions may be susceptible of construction either as a cause of action in tort or a cause of action upon an implied contract. The governing rule applicable here has been more accurately and briefly formulated by Pomeroy than by any other authority, in the following language:

"From certain acts or omissions of a party creating a liability to make compensation in damages, the law implies a promise to pay such compensation. Whenever this is so, and the acts or omisions are at the same time tortious, the twofold aspect of the single liability at once follows, and the injured party may treat it as arising from the tort, and enforce it by an action setting forth the tortious acts or defaults; or may treat it as arising from an implied contract and enforce it by an action setting forth the facts from which the promise is inferred by law." Pomeroy's Remedies and Remedial Rights, sections 568-801.

Under our system of pleading as construed by this court in the case of Nation v. Bank, 29 Okla. 823, 119 Pac. 978, and Stringer v. Kessler, 56 Okla. 50, 155 Pac. 867, in determining the nature of a cause of action, whether based upon contract or tort, such construction as will render the petition an action on a contract will be preferred to that of a tort. This court has adopted the Kansas rule of procedure on this point, and has approved the case of Smith v. McCarthy (Kan.) 18 Pac. 204, holding that:

"In such a case, where the facts alleged indicate a waiver of the tort, and are sufficient to constitute a cause of action on contract, it should be so regarded, although some words of the pleadings are adapted to an allegation in an action ex delicto."

At common law this was not the rule, for the reason that fictitious pleadings were indulged in and were framed more for form than for substance, and it was no difficulty to determine whether the pleader brought his action on a contract or in tort. Under the modern or code procedure, this matter is not always easy of determination because under the code or reformed procedure the pleader must state the facts in any character of action without feigned issues. However, the principal difficulty is removed when applying or computing the measure of damages. The rule adopted and which obtains in this state was stated by this court in the case of Nation v. Bank, supra, as follows:

"And in such cases if the cause of action as set forth is doubtful or ambiguous as to whether the allegations set out present an action in contract or tort, every intendment will be given to construe the cause as in contract and not in tort. See 4 Ency. Pl. & Pr. 754, and Smith v. McCarthy, 39 Kan. 308, 18 Pac. 204. And in order to determine the question of whether the action sounds in tort or contract, the measure of damages, the demand for judgment, and prayer may be consulted with a view of ascertaining and making the same certain. See 4 Ency. Pl. & Pr. 754, and authorities cited under note 1."

This language was quoted with approval in the case of Stringer v. Kessler, supra.

The plaintiffs in these cases in their respective petitions did not ask for any special damages, but only prayed for the actual market value of the wheat. The petitioners asked judgment for specified sums computed on the basis of $1.00 per bushel for the wheat actually delivered to defendant and not paid for; as, for example, the petitions state as follows (referring to the total in each case):

"* * * which amount is due, owing and unpaid from said defendant to said plaintiff."

The petitioners also prayed for the statutory rate of interest. The proof showed the market value to be $0.92 per bushel and upon that basis the judgments were rendered.

In this connection, although not stated in language of so general application as that of the late Mr. Pomeroy, quoted in a preceding paragraph, the language of the trial court on this particular point is to some extent elucidating, as well as interesting, which in part is as follows:

"In the opinion of this court, it does not make any difference whether you call this an action in conversion or an action to recover for the payment of wheat that had been sold and not paid for. I can give it

any kind of a name, you can give it any kind of a name that you want to. Lawyers and courts just as often misname the action, not quite as often, as they name it, and the courts are not bound by what you might denominate your action or your pleading, and owing to the fact that different colored slips of paper were used as scale tickets, that has no merit in it at all. They might have been red or white slips with the United States flag on them, and if they recited the fact that he purchased the wheat on a certain day, and in a given amount, and unloaded it in the elevator and those people received it, they would be bound to pay for it. * * * The evidence in this case shows that this wheat was never paid for; they got this man's wheat and never paid for it and the manner of getting it, as heretofore remarked, would not make any difference. If there was any irregularity in the agency, if it could be technically said that he was not employed to store wheat, it would not make any difference if he did store wheat in their name and they got it. They are responsible for it, sir. There is no law on earth that will permit any company, or any elevator, to take another man's property and use it for his own benefit and receive the money for it and defraud or defeat a man out of the value of his property. There is no law on earth for that, sir, divine or otherwise."

Counsel for defendant next contend that the judgments rendered and proceedings had in these cases are void, setting forth their specification or issue on this point in the following language:

"The gist of this proposition is that no lawful term of any district court in and for Grant county, Okla., was in session, or open, at the time the purported judgments herein were rendered and entered."

That proposition is predicated upon the fact that on January 20, 1925, prior to the date the judgments in these cases were rendered, the Legislature, with the approval of the Governor, enacted a law taking Grant county out of the Twelfth judicial district and attaching it to the Twentieth judicial district.

The Legislature did not disturb the terms or the time of holding the district court in any of the counties, either in the Twelfth or the Twentieth judicial district. As provided by law, the terms of the district court in Grant county are fixed as commencing in January, June, and October. The January, 1925, term of the district court of Grant county was in session on the day and date the measure was approved by the Governor, transferring that particular county to another (the Twentieth) judicial district. Judge Duval, the judge holding said court

and judge of the Twelfth judicial district, did not adjourn the January, 1925, term of court, nor did he proceed to hold court as a de facto judge. However, he could have done that—proceeded to hold court as a de facto judge continuously without any question as to the legality of his official acts when questioned only in a collateral proceeding. That matter, however, does not relate to this subject except as tending to show that the only purpose and vitality in said act of the Legislature was awarding to Grant county a different regular district judge.

When this measure was approved by the Governor, Judge Duval stepped off the bench and with a few eloquent words bade the county and its people good-bye. leaving the duties to the regular district judge of the Twentieth judicial district, before whom these cases were tried. At a later date and during the regular January, 1925, term, Judge Cullison, the regular district judge for the Twentieth judicial district, came into Grant county, opened court, proceeded to transact business and adjourned the January term to a specific date in the month of May, at which time he reconvened the adjourned term and proceeded with the trial of these cases.

Counsel for plaintiff in error contend that a district court exists lawfully only as a district court of a prescribed district, and when that prescribed district is interfered with to the extent of detaching therefrom any one of its units, a county, and attaching it to another district bearing a different number, that such act or acts operate to destroy or abolish any term of court in session, actual or constructive, at the time of the transfer of the particular county to such other judicial district.

We see no merit whatever in that contention. In this state district courts exist as district courts of the respective counties instead of district courts of the respective judicial districts. Litigants and lawyers file and prosecute their actions in the district court of a particular county and not of a particular judicial district, the number of which district is unknown to the average lawyer; and there is no necessity for his knowing it unless he intends to file his name as a candidate for district judge.

Under our law, and in all the states having similar statutory or constitutional provisions, the geographical jurisdiction of district courts, or their equivalent, is controlled by counties and not by districts.

The term "judicial district" is but a political and convenient arrangement for electing judges of the district court and prescribing primarily the territorial jurisdiction of the district judge, or where he may lawfully preside without special authority from the Supreme Court.

The Constitution, section 9, art. 7, provided for 21 judicial districts until the Legislature otherwise provided by law, either increasing or decreasing the number. The number has been increased instead of decreased. The Legislature has absolute and unlimited power to abolish all the designated judicial districts and comprise the state into one judicial district. This was done in the state of Nevada in the year 1886. The act was sustained by the Supreme Court of that state in the case of State ex rel. Coffin v. County Commissioners, 10 Pac. 901.

Certainly such an authorized act of the Legislature could not have the effect of destroying for a period of time the jurisdiction of the district courts, or terminate, by operation of law, their respective terms, as if they were adjourned sine die. A case squarely in point, on principle, although the analogy is not exact, is Ex parte Gardner, decided by the Supreme Court of Nevada in 1895, reported in 39 Pac. 570. In that case one Ida Gardner sued her husband, James Gardner, for divorce and for the custody of their minor child. The action was brought in Lyon county. It seemed that at that time and subsequently to 1886 the judicial districts had been rearranged. The district was composed of the counties of Lyon and Ormsby. By consent of counsel representing the defendant, the cause was transferred to Ormsby county in the same judicial district. The judge of the district court of Ormsby county, who was judge of the district court of Lyon county also, made an order in the case, after the cause had been transferred to Ormsby county, that the defendant produce the child whose custody was sought by the plaintiff. The defendant refused to do so and the judge ordered him guilty of contempt and had him incarcerated in jail. He sued out a writ of habeas corpus and ultimately obtained his release. In disposing of the matter and holding the court had no jurisdiction, the Supreme Court held that:

"Notwithstanding that Lyon and Ormsby counties are both in the same judicial district, the courts of those counties are still separate and distinct. The only thing they have in common is that the same judge presides over both. **A judicial district is simply a political division provided for by the Constitution, but arranged by the Legislature, for the purpose of economizing in the** number of judges. In fact, the inclusion of any two counties in the same district may almost be said to be accidental." (Emphasis ours.)

It is now the settled law of this state that a district court legally opened for all general purposes continues in session until it adjourns sine die and only expires by such adjournment or at the close of the last business day before the next regular term, and a regular term of district court is not ended by the convening of a term of court in another county in the same district. Boaz v. Martin et al., 101 Okla. 243, 225 Pac. 516.

Judge Duval, who was holding the regular January, 1925, term of the district court of Grant county, not having adjourned the court sine die, the term therefore remained open until the first Monday in June, 1925. In the interim these cases were tried.

Finding no material error committed by the trial court in these cases, the judgments are hereby affirmed.

BENNETT, JEFFREY, HERR, and DIFFENDAFFER, Commissioners. concur.

By the Court: It is so ordered.

Note.—See under (1) 14a C. J. p. 1373, §4080 (Anno) ; p. 1378, §4084; anno. L. R. A. 1916E, 236; 35 A. L. R. 912; 12 R. C. L. p. 76; 2 R. C. L. p. Supp. 1387; 6 R. C. L. Supp. p. 696. (2) 2 C. J. p. 643. §287; 14a C. J. p. 360, §2221. (3) 1 C. J. p. 1015, §138; 31 Cyc. pp. 83, 84, 85. (4) 15 C. J. p. 1004, §418.