## WILLS v. NATIONAL MINERAL CO.

No. 26390.  March 3, 1936.

John M. Goldesberry and Gerald B. Klein, for plaintiff in error.

I. D. Moseley, for defendant in error.

PHELPS, J. Plaintiff sued to recover for personal injuries sustained when she unwrapped an article of machinery manufactured, wrapped, and shipped by defendant, alleging that by reason of defective wrapping and absence of warning a plunger shot therefrom and entered her head. Defendant had sold the article to a jobber in Tulsa, who had sent it to plaintiff in Collinsville, Okla., for sale on approval. The jobber is also a defendant, but is not a party to this appeal.

The defendant National Mineral Company is a foreign corporation not licensed to do business in this state and has no resident service agent for service of process, nor has it filed a copy of its articles of incorporation or charter with the Secretary of State. The plaintiff served summons upon the Secretary of State under section 126, O. S. 1931, authorizing process upon such corporations "doing business" within the state of Oklahoma. After several hearings at which much evidence was taken, the trial court sustained defendant's special appearance and motion to quash, from which plaintiff appeals. The order was based on the conclusion that defendant was not doing business in the state within the meaning of said section. It is necessary to set forth the evidence in considerable detail:

Defendant is an Illinois corporation with its principal place of business in Chicago, engaged in manufacturing and selling mechanical appliances and machinery for beauty parlors and barber shops. It marketed its products in Oklahoma through the agency of a Mr. Sachs, who also covered several other states and devoted his entire time to that work. He visited eight or ten different cities within the state three or four times per year, and when in Tulsa would spend about a week there and in that vicinity. He traveled in his own car and worked on commission. He customarily carried samples along with him, but occasionally had machines shipped to him here. His usual procedure was to demonstrate and take orders, subject to approval of the home office at Chicago, and then the supplies were shipped f.o.b. Chicago, according to his testimony. However, there were rather frequent exceptions to this method, as will appear from further examination of the evidence.

As security for payment of the jobbers' indebtedness to defendant, the defendant required some of the jobbers to assign the conditional sales contracts of customers, and also the notes of customers, to defendant. Thus until payment for such goods the title thereto was vested in defendant, as collateral for the jobbers' debts. Defendant's witness testified that where necessary defendant sued on the contracts.

Witness Barrackman, manager of the

Tulsa office of a certain jobber, testified that on several occasions the representative, Sachs, made an "adjustment" on unsatisfactory merchandise by retaking possession of it and having it replaced by other shipments from Chicago. The codefendant, Bigelow, who is also a Tulsa jobber, testified that purchasers from him, whose notes and conditional sales contracts he had assigned to defendant, paid both to him and to the defendant, and that the defendant regularly sent notices of forthcoming installment due dates to his customers; that defendant sells its merchandise not only to jobbers, but also to beauty operator schools.

Defendant's representative, Sachs, visited plaintiff several times in an attempt to settle the claim, and corresponded with defendant's home office concerning it. Sachs, the agent, testified that several days before the hearing two permanent wave machines and another machine were shipped by defendant to him in Tulsa, that they arrived in parts and that he assembled the machines in that city and sold two of them to a beauty school there and tried to sell the other machine to other people in Tulsa, and that he had sold other shipments to people or business concerns, in the same manner, two or three other times during the preceding ten days. His statement that those machines were shipped to him purely for demonstration purposes was therefore nullified by his own testimony.

Earl Hughes, a dealer in beauty supplies at Sapulpa, testified by affidavit that the defendant consigned to him certain merchandise for display and sale, which remained the property of the defendant; that he had an agreement with Sachs that he could take purchasers' conditional sales contracts covering these sales and send those contracts to the defendant and that the defendant would then handle collections for the merchandise thus sold, and replace the same with similar merchandise for the continued display. He also testified that he bought merchandise from the salesman and paid him cash therefor. Though Sachs testified that these transactions were not complete until they were approved in Chicago, there was no competent evidence, and no effort at all, other than the conclusions of defendant's witnesses, to controvert the testimony of Hughes. In the affidavit of the defendant's president it was stated that the goods were billed to Hughes on consignment by "mistake," during his absence from the city of Chicago.

Harry Glenn, engaged in business in Drumright, testified that he had dealt with the defendant for years and that in 1934 Sachs personally "picked up" a portion of the cosmetics which witness had bought from defendant and credited witness's account with defendant to that extent; that Sachs also made an adjustment of certain unsatisfactory merchandise in possession of witness. Sachs testified that he had picked up this merchandise because Glenn was in debt to the defendant, but admitted that he took the merchandise over to Sapulpa and there sold it to Earl Hughes, and that he sent his own money to Chicago in payment therefor, and received about $15 from Hughes, later on, in payment of the personal debt of Hughes to him; that thus he picked up the merchandise on his "own responsibility." He further testified that sometimes but not often he collected money on accounts.

Defendant required jobbers to sign contracts agreeing to assign defendant the notes and conditional sales contracts of purchasers. A promissory note signed by one Harry Green, payable to defendant at Drumright, Okla., in the sum of $100 was introduced in evidence.

A Mrs. Hamm, of Tulsa, testified that she helped Sachs dispose of some demonstration machines and that she gave her permission for the defendant to bill her for the purchase price of the machines. The affidavit of Mr. Stein, president, and Mr. Gidwitz, secretary of the defendant corporation, averred in general terms that Sachs did not have authority to do anything other than accept orders for approval at Chicago, and that the defendant had no warehouse or place of business in Oklahoma, and similar general averments of no particular help, illustrative of which was the statement that the defendant was not "doing business" in Oklahoma, which was purely a conclusion.

As to all the controverted questions of fact, and when we say controverted we mean disputed by competent, admissible evidence, we proceed on the assumption that those controverted issues were decided in favor of the defendant, under the rule that where there is any competent evidence to sustain a finding of the trial court, the finding on that issue will not be disturbed on review; but we take as true those facts presented in evidence by plaintiff which were either admitted by defendant or were not controverted by competent evidence.

The solution of this question depends on

what is meant by the term "doing business," within the meaning of section 126, supra. We have devoted much study and research to the task of finding some practical, workable rule or definition, and while we find the same phrases repeated in scores of decisions from all jurisdictions, they consist mainly of generalities of little help except in obvious cases. Those same phrases appear in so many of the decisions that it is unnecessary to give citations. Generally speaking, they are too broad for application to a close case, as is evident from the following samples:

"The doing or performing of a series of acts which occupy the time, attention and labor of men for the purpose of livelihood, profit or pleasure."

"When it appears that the corporation is there carrying on business in such sense as to manifest its presence within the state, although the business may be entirely interstate in its character."

"The business done must be of such a character and extent as to warrant the inference that the company has subjected itself to the jurisdiction and laws of the state."

"The foreign corporation must have entered the state and engaged there in carrying on, and transacting, through its agents, the ordinary business in which it is engaged."

"The transaction of business must be such that the corporation is for the time being within the state in which it is sued."

"The corporation must be there by its agent authorized to transact its business in the state."

A great deal of confusion has been caused by failing to distinguish between cases where the question is the necessity of domesticating before bringing suit, and cases where the question is whether the foreign corporation is amenable to legal process. The standards are not the same, and the quality, character, and quantity of business conducted within the state may be sufficient to subject a foreign corporation to process and yet be insufficient to require it to take out a license. Thompson on Corporations (3rd Ed.) vol. 8, p. 845; 21 R. C. L. 1342; 14A C. J. 1372, and cases cited. Such corporations may be doing business within the state so as to be subject to the jurisdiction of the local courts and yet not be subject to a statute prescribing conditions of their doing business within the state. The basis of the distinction is that the power of the state to subject a foreign corporation to local regulations is restricted by the commerce clause of the federal Constitution, but that a state may subject such a corporation which is doing business in the state to service of process therein notwithstanding the fact that the local activities of the corporation are confined to transactions in interstate commerce. International Harvester Co. v. Kentucky, 234 U. S. 579, 34 Sup. Ct. 944, 58 L. Ed. 1479.

Further difficulty is encountered by confusing this question with the interstate question. Many cases cited by defendant in error are concerned with the question of whether the state may impose restrictions upon interstate commerce by requiring the foreign corporation to become licensed in the local state,—which is not the question before us. If the foreign corporation is in fact doing business within the state in such manner as to subject it to process of the local state courts, it does not matter that the transactions in the state grow from interstate commerce. International Harvester Co. v. Kentucky, supra; 21 R. C. L. 1342; 14A C. J. 1372. In cases where necessity of license is the issue, two situations are possible, in neither of which is a license required: (a) Where the corporation is not doing business in the state, within the meaning of the statute, or (b) where the corporation is doing business within the state, but the business is interstate or incident thereto. In cases where amenability to process is the issue there is but one question to be determined, and that is whether the corporation is doing business within the state within the meaning of the statute, regardless of whether the business conducted is interstate.

As illustrative of the fact that what is "doing business" for the purpose of acquiring jurisdiction is not necessarily such "doing business" or "transacting business" as makes it necessary for the foreign corporation to domesticate before suing a resident, we have this situation before us: Out of ten decisions of this court which are called to our attention, four of them involve the former question and six of them involve the latter question; with one exception, the four cases held the activities of the foreign corporation sufficient for the purpose of process, and the six cases involving necessity of license precedent to maintenance of action analyzed the situation to be not that kind of "doing business" necessitating the taking out of a license. The cases do not point out a distinction, but the results amply imply it. In the following cases it was pointed out that either the quality and quantity of

the local business, or its interstate character, presented a situation where it was no' necessary to the maintenance of an action by the corporation that it become domesticated: Fuller v. Allen, 46 Okla. 417, 148 P. 1008; Denison v. Phipps, 87 Okla. 299, 211 P. 83; Barnett v. Aetna Explosives Co., Inc., 96 Okla. 132, 220 P. 874; Pauline Oil & Gas Co. v. Mutual Tank Line Co., 118 Okla. 111, 246 P. 851; Consolidated Pipe Line Co. \ British American Oil Co., 163 Okla. 171, 21 P. (2d) 762; Metal Door & Trim Co. v. Hunt, 170 Okla. 240, 39 P. (2d) 72.

Conversely, with one exception to be hereinafter noted, where the question was not necessity of license in order to maintain an action, but was whether the local activities of the foreign corporation were such "doin·" business" as authorized service on the Secretary of State, the question was answered in the affirmative. Consolidated Flour Mills Co. v. Muegge, 127 Okla. 295, 260 P. 745 (reversed by Supreme Court of the United States because statute in force at that time failed to warrant reasonable probability that the Secretary of State would notify the defendant of suit, 278 U. S. 559, 49 Sup. Ct. 17; statute now amended); Clement v. Coon, 161 Okla. 216, 18 P. (2d) 1059; R. W. Yates Laundry Machinery Co. v. Hoppe, 160 Okla. 70, 15 P. (2d) 585. In Harrell v. Peters Cartridge Co., 36 Okla. 684, 129 P. 872, 44 L. R. A. (N. S.) 1094, the question was whether the defendant foreign corporation was doing business within this state in such manner as to subject itself to the jurisdiction of the local courts. The sole activities of the corporation's representative in going about the state giving shooting exhibitions in order to advertise and demonstrate the corporation's products were held not "doing business" within the meaning of the statute, which case on its face provides its own distinction from the facts in the instant case. In Clement v. Coon, supra, a foreign corporation manufactured electric signs in Texas and sold them to customers in Oklahoma through their soliciting agent, who prepared the contracts, which contracts were made subject to acceptance by the company in Dallas. The goods were shipped f.o.b. factory. The signs would as a rule be hung by or under the supervision of the agent. Sometimes when purchasers became delinquent the agent called on them and urged payment, and occasionally collected the money and sent it to the company at Dallas. Citing the oft-quoted decision in International Harvester Co. v. Kentucky, supra, we held that it was such doing business within this state as gave our courts jurisdiction under section 126, supra. In the Yates Laundry Case, supra, the contracts were not to be deemed binding until accepted at the home office. Upon the authority of Clement v. Coon, supra, we held the following business activities, as explained by the syllabus, sufficient to authorize acquiring jurisdiction by service upon the Secretary of State:

"A foreign corporation, which employs an agent in this state to solicit sales for its machinery manufactured in another state and authorizes such agent to take old machines in trade as part payment thereon, and such machines so taken in by the agent are placed in storage in this state and sold and delivered therefrom by him to other parties, will be held to be transacting business within the state within the meaning of sections 5433 and 5436, C. O. S. 1921."

While there are minor fact distinctions between the last two cases cited above, and the facts in the instant case, those distinctions are not so wide as to warrant a different result. In fact, from all legal viewpoints the cases are substantially identical.

Now what is meant by "doing business," for the purpose of acquiring jurisdiction over a foreign corporation? As must ever be the case when neither the Legislatures nor the courts have laid down a definite rule of law, this controversial question has resulted in a wide field of litigation from which one may pick and choose abundant decisions to support almost any contention he cares to advance. It has even been held that a mail order transaction is doing business within the state, and on the opposite extreme one may find authority that a foreign corporation may hire labor, buy materials, send its superintendent and erect elevators within the local state and still not be doing business within that state. In 21 R. C. L. at p. 1343, it is said that the tendency of the courts seems to be toward considering agents engaged in soliciting business as the representatives of the corporation for the service of process, while the opposite is pronounced by Thompson on Corporations (3d Ed.) sec. 6633. Of what help is it to repeat, as is so often done, that "the business done must be of such a character and extent as to warrant the inference that the company has subjected itself to the jurisdiction and laws of the state," when the question of what constitutes such subjection is the very point we are seeking?

Business is largely the barter, sale, or exchange of things of value, usually property. "Doing" business is therefore the engaging

in such pursuit. The doing of business involves not only the ownership, possession, or control of property, but such functions as dealing with others in reference to the property, the exercise of discretion, the making of business decisions, the execution of contracts. It includes the functions of marketing the product, by advertising and solicitation, and of collecting for the sold product. It may conservatively be said that wherever an important combination of these functions is being performed, business is being done. A corporation moves and acts only in the persons of its agents, be they officers or otherwise, within the scope or apparent scope of their authority. Therefore, wherever the agent is performing important business functions for the corporation, involving the exercise of discretion, whereunder contractual relationships are by his efforts established between the corporation and others in that place, the corporation is "present" and doing business.

Now let us analyze just what a corporation of this kind does. It (1) maintains a place or places of business; (2) buys raw products; (3) manufactures raw products into parts; (4) assembles those parts into finished machines; (5) advertises, demonstrates, and establishes contacts with the public; (6) solicits; (7) contracts mutual obligations, part performance of which contracts are in the state of the purchaser; (8) delivers; (9) instructs in a usage of equipment; (10) collects; (11) adjusts accounts; (12) negotiates or attempts to negotiate settlement of claims.

The evidence in this case clearly reveals that nine of the foregoing 12 acts of business were performed in this state, by the agent and for the corporation. They are numbers 4 to 12, inclusive. It is true that the mere assemblage of parts within this state, or the mere solicitation of orders, or the mere delivery might possibly not constitute doing business, and the defendant cites many cases where it is held that the "mere" doing of some particular function is not the doing of business. But the situation at bar is not the "mere" doing of any one particular function, but the performance of a number of functions, the combined effect of which clearly appears to us to be such sufficient doing of business as to subject the corporation to the jurisdiction of the courts of this state. Although defendant's authorities to the effect that the mere solicitation of business is not sufficient to constitute "doing business" for purpose of process may be appropriate to the facts in those cases, they do not hold that the solicitation of business

is not at least some evidence of "doing business,"—and the same may be said of all other authorities cited by defendant concerning "mere" performance of this or some other one function of business. All of the following are obviously significant in determining the question: "Making collections in the local state; retaking physical possession of property within the state, transferring it to other points in the state and reselling it; designating a promissory note as payable in the local state; alteration of contract with resident, by agent present within the state; placing goods in hands of resident on consignment for sale; retaining title to property located within the state; continuous course of business in the solicitation of orders for several years in the state.

The instant case is not one of those involving a mere isolated transaction; we have here a plurality of transactions evidenced from the defendant's activities in only a restricted portion of the state, and in view of the defendant's evidence that its operations cover the entire state the inference is not too far fetched that the character, quality, and quantity of its business in the remainder of the state were probably similar.

One of these transactions occurred after the service of summons. It was nevertheless admissible, however, for the purpose of shedding light on the nature of the defendant's business at the time of service of process, which was not long before the transaction evidenced. A doing of business at the time of suit may be inferred from a course of conduct pursued before and after. International Cotton Seed Co. v. Wheelock, 124 Ala. 367, 27 So. 517; 14A C. J. 1378. Of course, if the date of the transaction is too far removed from the date of suit to serve as evidence of the probable situation at the time of suit, such evidence should be rejected. In the instant case, the transaction occurred in October of 1934 and the suit was filed in June of the same year. The defendant had sold merchandise in the state for years preceding the filing of the suit.

The defendant contends that when the agent performed such acts as accepting payment of debts, repossessing merchandise and reselling it to other customers, and such conduct, he was exceeding his authority. Nevertheless, it appears that the defendant ratified some of these acts. In addition to such ratification, this identical point was decided adversely to defendant's contention in Consolidated Flour Mills Co. v. Muegge, 127 Okla. 295, 260 P. 745, at p. 749, citing numerous authorities in point.

Defendant further contends that plaintiff's petition shows that her injury did not arise out of the corporation's doing business within the state and that therefore, according to the terms of section 126, supra, such service of process is unauthorized. In the first place, we are not prepared to say that the injury, if there was such injury, did not arise out of the corporation's doing business within the state. In the second place, it does not appear to be necessary that the cause of action arise out of the particular "doing business" which was made the subject of process, for the pertinent portion of the section reads:

"Any person * * * having any cause of action against any such foreign corporation, which cause of action rose out of the said foreign corporation doing business within the state of Oklahoma, or while the said foreign corporation was doing business within the state of Oklahoma, may file suit. * * *"

The judgment of the trial court sustaining the motion to quash is therefore reversed and the cause is remanded, with instructions to overrule the motion and to further proceed with the case not inconsistently with the views herein expressed.

McNEILL, C. J., OSBORN, V. C. J., and BUSBY and CORN, JJ., concur.