[Civil No. 3684. Filed October 5, 1936.]

[61 Pac. (2d) 377.]

SOUTHERN PACIFIC RAILROAD COMPANY OF MEXICO, a Corporation, and SOUTHERN PACIFIC COMPANY, a Corporation, Appellants, v. MANUEL F. GONZALEZ, Appellee.

Mr. Francis M. Hartman, for Appellants. Mr. C. O. Amonette, Associate Counsel.

Messrs. Mathews & Bilby and Mr. T. K. Shoenhair, for Appellee.

LOCKWOOD, C. J.—The complaint in this case sets up two separate causes of action by Manuel F. Gonzalez, hereinafter called plaintiff, against Southern Pacific Railroad Company of Mexico, a corpo-

ration, hereinafter called the Mexican company, and Southern Pacific company, a corporation, hereinafter called the American company, defendants, to recover for damages to two cars of tomatoes, one shipped from Cuidad Obregon, Sonora, Mexico, to Ottawa, Canada, hereinafter called the Canadian car, and one shipped from Verdura, Sinaloa, Mexico, to Chicago, Illinois, hereinafter called the Illinois car.
· So far as the Canadian car is concerned, the allegation is that the defendants contracted to safely carry and deliver the car of tomatoes to its destination, but that they negligently caused the bunkers of the car to be filled with ice and permitted said ice to remain therein up to a certain point, thereby causing the tomatoes to chill and freeze, and thereafter carelessly and negligently placed heaters in the car, which caused the tomatoes to thaw, decay, and spoil.

The allegation regarding the Illinois car is that the defendants, after contracting to carry and deliver the car safely, were negligent in handling the same in transit, and allowed the crates or boxes to be jammed and broken and their contents thus spilled, disarranged and damaged.

Separate demurrers were filed which raised the point, among others, that the cause of action as to the Canadian car was barred by the statute of limitations of Arizona, being subdivision 2 of section 2059, Revised Code of 1928. These demurrers were overruled.

The Mexican company then answered, pleading first a general denial and the statute of limitations, and then alleged that it conducted a railroad wholly within the Republic of Mexico, and that the tomatoes were shipped from the originating point in Mexico under certain bills of lading made in Mexico between

it and the shipper; that the bills of lading provided, among other things, that anyone making claim for loss, shortage or damage for freight so shipped should present such claim within thirty days from the date on which the loss actually occurred, and that the shipper waived in favor of the Mexican company those sections of the Mexican Commercial Code which provided that a shipper should have a specified time in which to bring an action arising out of liability of a carrier for damage to freight. It further pleaded that no claims were presented to it within the thirty days aforesaid, and that both causes of action were, therefore, barred under the laws of Mexico. It then alleged as a defense to the cause of action involving the Canadian car that the shipper had instructed the company to place ice in the car at the loading point, which it did, and that the shipper proceeded to load the car knowing the ice was in the bunkers, and instructed it to ship the tomatoes to Canada. It then claimed that by virtue of certain rules established by the Interstate Commerce Commission of the United States neither the Mexican company nor its connecting carrier were permitted to remove the ice from the car between Nogales, Arizona, and Jonesboro, Arkansas, at which place it was removed, and that if any injury or damage resulted from the ice being placed in the car, it was due to the negligence of plaintiff himself, and not to that of the carriers. It further alleged that no damage nor injury was sustained by either of the shipments upon its lines, and that it, so far as the shipments in question were concerned, was not subject to that act of Congress relating to the liability of an initial carrier, being section 20 (11) of title 49 U. S. C. A., and commonly known as the Carmack Amendment.

The American company pleaded a general denial and also set up the same matters regarding the ice in the Canadian car that were pleaded by the Mexican company. It claimed the cause of action, so far as the Canadian car was concerned, was barred by the Arizona statute of limitations as aforesaid; that it was not the initial carrier, and that no damage nor injury to either of said shipments was sustained on its lines of railroad.

The theory of plaintiff's case against the Mexican company was that while the actual damage, both to the Canadian car and the Illinois car, occurred on the lines of the American company, the Mexican company was nevertheless liable for such damage as an initial carrier under the terms of the Carmack Amendment, as aforesaid. He further urged that his cause of action against the American company was on a contract to transport safely, and that it did not sound in tort. The court adopted plaintiff's theory of the case, and refused to admit in evidence the Mexican laws as pleaded by the defendants.

At the close of all of the evidence both companies made separate motions for directed verdicts as to each of the two causes of action. Plaintiff conceded that the motion of the American company, so far as the second cause of action involving the Illinois car was concerned, was good, and the motion for a directed verdict by that company on the second cause of action was granted. The other motions were denied, and the case was submitted to a jury under various instructions, one of which was that the Carmack Amendment applied to both shipments, and that the Mexican company was the initial carrier and therefore liable for any damages occurring either on its lines or on that of the connecting carrier, and

that it was not necessary for the plaintiff to prove which of the carriers caused the damages, but merely that the injury did occur before the cars arrived at their destinations. Three verdicts were returned in favor of the plaintiff, against both companies on the first cause of action, and against the Mexican company on the second cause of action. Judgment was duly rendered on the verdicts, whereupon, after the usual motions for new trial were overruled, this appeal was taken.

Certain of the facts involved in this case are admitted; others are in dispute. We state the admitted facts first.

During all of the times mentioned in the complaint the Mexican company was and is a common carrier by rail, operating a railroad wholly within the Republic of Mexico, which railroad terminates at the international boundary line between it and the United States, at Nogales, Sonora, Mexico, connecting there with the line of railroad of the defendant Southern Pacific Company, which is an American company operating an extensive railroad system within the United States. The Canadian car was delivered to the Mexican company at Cuidad Obregon, Sonora, Mexico, on December 15, 1930, for shipment over the line of railroad of the Mexican company and the line of its connecting carrier, by virtue of a certain contract in writing, commonly called a bill of lading, which plaintiff's assignor entered into in the Republic of Mexico. When the tomatoes were loaded upon the car there were some two tons of ice in each bunker, of which about 3,000 pounds remained when the car arrived at Nogales, Sonora, on December 16th. The plaintiff had purchased the car from Manuel Sam Lee Produce Company, the party in whose name the bill of lading had been executed,

and after its arrival at Nogales, Sonora, he surrendered to the Mexican company the original bill of lading, and a new one on substantially the same terms so far as conditions of shipment and claims for damages were concerned was made in Mexico between the Mexican company and plaintiff for shipment over the lines of the Mexican company in Mexico and its connecting carrier in the United States, to Ottawa, Canada. This car was shipped by plaintiff through the United States to Canada in bond. After this bill of lading was made out, the car crossed the international boundary into the United States, was inspected by the American authorities, and left Nogales over the line of the American company en route to Canada with the following instructions:

"Standard ventilation to Kansas State Line. Carrier's Protective Service beyond. Standard heating and ventilation service in Canada."

After the car had departed, plaintiff delivered the carrier a diversion order which provided

"Standard ventilation to Missouri State Line. Carrier's Protective Service beyond. Standard heating and ventilation in Canada; ice to be taken out at first available point."

Thereafter another diversion order was delivered by plaintiff to carrier, with the following instructions:

"Standard ventilation, pull ice first available point within heater territory and place under Carrier's Protective Service within heater territory; standard ventilation beyond; standard heating and ventilation in Canada."

The car passed through the states of Arizona, New Mexico, Texas, Arkansas, Missouri, Indiana and Illinois over various carriers and finally arrived at

Ottawa, Canada. It reached Jonesboro, Arkansas, about seventy miles from the Missouri-Arkansas line, on the evening of December 21st, at which time and place whatever ice remained in the car was taken out, and an unlighted heater was placed in the north end bunker of the car. It arrived at Ottawa on the 25th of December, 1930, and was inspected the next day, at which time the tomatoes were found to be in much poorer condition than at the time it crossed the line, and they were sold at a much lower price than would have been received had they reached the destination in good condition.

The Illinois car was delivered to the Mexican company at Verdura, Sinaloa, Mexico, on April 21, 1932, by the plaintiff himself, for transportation over the line of the Mexican company and its connecting carrier to Tucson, Arizona, under a bill of lading similar in conditions to that of the Canadian car. When it crossed the line on April 22, 1932, the load was intact and not shifting, and so far as could be seen it was in good condition, all the boxes being in their proper places. It was delivered by the American company at Deming, New Mexico, to the Atchison, Topeka and Santa Fé Railway, and then passed over three other connecting carriers before it reached Chicago. When it arrived at that place, it was found that the top layer of the load was shifted and some of the boxes broken and contents partially spilled, but it did not appear at what place nor under the control of which connecting carrier in the United States the damage occurred.

The contracts or bills of lading made between the plaintiff and the Mexican company in Mexico contained, among other things, the following provision:

"Received . . . the freight described below . . . consigned and destined as indicated below, which

said company agrees to carry to point of destination, providing the latter is within the lines of this company; on the other hand, it will deliver to other carrier to be transported to said point of destination.

"It is mutually agreed that transportation service will be subject to the laws and regulations governing railroads, and to all conditions contained in the document."

Among these conditions were the following:

"In case of loss, shortage, or damage, in whole or in part, suffered by freight delivered to the company for its transportation, either originating from fire, theft or any other cause for which the company may be held responsible, if the damage is a total loss the responsibility of the company will cease by paying to the claimant the original cost of the merchandise and refunding the amount of freight charges paid; and in case of shortage or damage, the amount of partial loss or damage will only be paid, taking into consideration its original cost, and proportion of freight paid.

"With this end in view, persons making claims should present them within thirty days from date in (on) which the loss, shortage or damage actually occurred, enclosing bill of lading bearing notation of the loss or damage placed by agent at destination point as well as other vouchers showing the responsibility of the company.

"After this time has elapsed no claim will be accepted; therefore, the shipper or person representing him, waives in favor of the company the term designated in Paragraph II of Article 592, and Paragraph III of Article 1043 of the Commercial Code.

"In case this bill of lading should cover a shipment consigned to a point not included in the lines of this company, the responsibility of the latter ceases as soon as shipment is delivered to connecting line which is to carry shipment beyond, in which case the shipper agrees to settle up with the new carrier, waiving the benefits mentioned in Article 577 of the Commercial Code."

The law of Mexico referred to in the conditions as articles 592 and 1043 of the Commercial Code read as follows, so far as material:

"Art. 592. The liability of the carrier for loss, defalcations or damage is extinguished: II. By the lapse of six months, in the case of journeys made in the Republic, and of one year in the case of those made for foreign countries."

"Art. 1043. One year shall prescribe: III. All causes of action derived from contracts for freight by land or sea."

No claims were presented to either the American or Mexican companies for loss, shortage, or damage on either of the cars within thirty days from their delivery at their destination. The Canadian car was unloaded two years, seven months, and three days before this action was commenced, and the Illinois car one year and three months before it was commenced. No part of the transportation of either one of the cars by the Mexican company was in the United States; all of its services were, by the bill of lading, to be performed and were performed within the Republic of Mexico.

There are a number of interesting and important questions raised by this appeal, and we think the first which should be considered and determined is whether or not the Mexican company was subject to the terms of the Interstate Commerce Act, and particularly of the Carmack Amendment. This act, so far as material for the purpose of determining this question, reads as follows:

"Section 1, par. (1) Carriers subject to regulation. The provisions of this chapter [Act] shall apply to common carriers engaged in—

"(a) The transportation of passengers or property wholly by railroad . . .

"(c) . . . from or to any place in the United States to or from a foreign country, *but only in so far as such transportation takes place within the United States.*

"(2) Transportation subject to regulation. The provisions of this chapter [Act] shall also apply to such transportation of passengers and property and transmission of intelligence, but only in so far as such transportation or transmission takes place within the United States."

"§ 20. (11) Any common carrier, railroad, or transportation company subject to the provisions of this chapter [Act] receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading." 49 U. S. C. A., §§ 1, 20 (11). (Italics ours.)

It is apparent that the act applies to all carriers engaged in the transportation of passengers or property by railroad from any place in the United States to a foreign country, or from any place in a foreign country to a place within the United States, but it is expressly also provided that it only applies *in so far as such transportation takes* place within the United States. Since all of the transportation of the cars in question by the Mexican company took place outside of the United States, if there were nothing further in the act it is obvious that nothing which happened during such transportation by the Mexican company would be subject to the provisions of the

act. Congress, however, after the passage of the original act, adopted what is known as the Carmack Amendment, which is set forth in section 20 (11), *supra*. The purpose of this amendment is a change in the common law. Under the latter a carrier was only responsible for the goods delivered to it until it delivered them to a connecting carrier, and when between the point of original shipment and that of final delivery some damage occurred to the goods, it was necessary for the shipper to sue the carrier upon whose line the damage occurred and to prove that it did so occur. When, as frequently happens in long distance shipments, goods passed over the lines of half a dozen connecting carriers, the shipper as a rule never saw them from the time he delivered them to the original carrier until his agent received them or failed to receive them from the last carrier, and was thus placed in a very unfair situation. He knew his goods had been damaged and that he was entitled to recover therefor, but had no means of determining who was legally responsible for the damage. To remedy this very inequitable rule, Congress adopted the Carmack Amendment which, in substance, provides that where goods are shipped over a number of carriers, the initial carrier shall be liable to the lawful holder of the bill of lading for the goods, regardless of where the damage was done, leaving it to the respective carriers to settle among themselves their ultimate liability to each other.

In view of the conditions of modern railroad traffic, we think that this was a very equitable method of handling the question. It was, however, purely a matter of federal statute, and the question before us is: Was the statute meant to apply to initial carriers like the Mexican company in this case (a) whose

lines lie wholly without the jurisdiction of the United States, and (b) all of whose acts in connection with the goods involved herein were performed outside of this country?

 It is a general rule of international law that no law has any effect of its own force beyond the limits of the sovereignty from which its authority is derived. As was said by Chief Justice MAR-SHALL in the case of *The Antelope,* 10 Wheat. 66, 122, 6 L. Ed. 268:

"No principle of general law is more universally acknowledged, than the perfect equality of nations. Russia and Geneva have equal rights. It results from this equality, that no one can rightfully impose a rule on another. Each legislates for itself, but its legislation can operate on itself alone."

In *Polydore* v. *Prince,* 19 Fed. Cas., page 950, No. 11,257, it was held as follows:

"It is among the first maxims of the *jus gentium* that the legislative power of every nation is confined to its own territorial limits. This is a principle which results directly and necessarily from the independence of nations. Whatever may be the nature of the law, whether it relates purely to persons and their civil qualities, or to things, it can, *proprio vigore,* have no force within the territorial limits of another nation."

And in *Roche* v. *Washington,* 19 Ind. 53, 81 Am. Dec. 376, the court held:

"Now, it is true as a general proposition, that the laws of a nation are operative only within the limits of the territory over which the jurisdiction of the nation extends. *They do not, as a general proposition, follow the individuals of such nation into the jurisdictional limits of another nation, so as to attach to acts done in such other nation."* (Italics ours.)

This rule is clearly consonant with the fundamental principles of international law and the rights of

independent sovereignties. It would, therefore, seem to follow directly therefrom that it is beyond the power of the federal government of the United States to pass a law which shall impose a liability even on citizens of this country *for acts done wholly within the limits of a foreign country.* This principle is so fundamentally just that it apparently should be accepted as axiomatic, but counsel for plaintiff contend that this is not the law and cite to us in support of their contention the case of *Galveston, H. & S. A. R. Co.* v. *Woodbury,* 254 U. S. 357, 41 Sup. Ct. 114, 115, 65 L. Ed. 301. Of course the decisions of the Supreme Court of the United States on federal questions are binding upon us, regardless of what we may think of the rule laid down by that august tribunal, but does the opinion, in truth, sustain the position of counsel for plaintiff? The facts of the case were as follows: Mrs. L. H. Woodbury, while in the Dominion of Canada, purchased within said Dominion from a Canadian railroad corporation a ticket entitling her to travel over it and connecting lines from a station in Canada to El Paso and return. The ticket, among other things, gave her passage over the lines of defendant from San Antonio to El Paso. She took one of defendant's trains at San Antonio and checked her trunk to El Paso over defendant's lines; it was lost, and she sued the company in the state courts for the value of the trunk and contents, which the jury found to be worth $500. The defendant claimed that she was on an interstate journey, and that under the Interstate Commerce Act, it was not liable for more than $100. Plaintiff insisted that her transportation was not subject to regulation by the act because it began in a foreign country, and that the liability was governed by the law of Canada, which she contended held the limi-

tation of liability was invalid. The trial court found that the Interstate Commerce Act applied and limited her recovery to $100. This judgment was reversed by the Court of Civil Appeals of Texas (209 S. W. 432) which entered judgment in favor of plaintiff for the sum of $500, and the case came up on *certiorari*. It will be observed that there was no attempt in this case to hold the Canadian corporation—the initial carrier—liable under the Carmack Amendment. The suit was against the connecting carrier on whose lines the loss actually occurred.

The court said as follows:

"If Mrs. Woodbury's journey had started in New York instead of across the border in Canada, the provision in the published tariff would clearly have limited the liability of the carrier to $100; for her journey would have been interstate, although the particular stage of it on which the trunk was lost lay wholly within the state of Texas. . . .

"But counsel for Mrs. Woodbury insists that solely because her journey originated in Canada the provisions of the Act to Regulate Commerce do not apply. The contention is that section 1 of the act of 1887 does not apply to the transportation of passengers from a foreign country to a point in the United States. To this there are two answers. The first is that the transportation here in question is not that of a passenger, but of property. *Boston & M. R. R.* v. *Hooker* [233 U. S. 97, 34 Sup. Ct. 526, 58 L. Ed. 868, L. R. A. 1915B 450], *supra*. The second is that the act does apply to the transportation of both passengers and property from an *adjacent* foreign country, such as Canada. Section 1 declares that the act applies to 'any common carrier . . . engaged in the transportation of passengers or property . . . from any place in the United States to an adjacent foreign country.' A carrier engaged in transportation by rail *to* an adjacent foreign country is, at least ordinarily, engaged in transportation also *from* that country to the United States.

The test of the application of the act is not the direction of the movement, but the nature of the transportation as determined by the field of the carriers' operation. This is the construction placed upon the act by the Interstate Commerce Commission. . . .

"Since the transportation here in question was subject to the Act to Regulate Commerce, both carrier and passenger were bound by the provisions of the published tariffs. As these limited the recovery for baggage carried to $100, in the absence of a declaration of higher value and the payment of an excess charge, and as no such declaration was made and excess charge paid, that sum only was recoverable."

We think that the vital portion of the decision was that which held that although the act, by its express terms, only applied to "transportation of passengers or property . . . *from* any place in the United States *to* an adjacent foreign country" by implication it also applied to transportation *to* any place in the United States *from* an adjacent foreign country. Nothing whatever was said in the decision as to the liability of the Canadian company under any circumstances nor what would have been its liability had the trunk been lost within the Dominion of Canada, nor was the question of the liability of the initial carrier, under the Carmack Amendment, discussed. We are of the opinion that the case is not a precedent either one way or the other upon the question involved in the present action.

The precise point in question, so far as we have been able to ascertain, has never been directly and specifically adjudicated in any case. There are, however, two reported cases and several decisions of the Interstate Commerce Commission which do throw light on the situation. In the case of *Watson* v. *Canadian Pacific R. Co.*, 237 Ill. App. 478, the facts were as follows: Watson, as plaintiff, brought suit

against the Canadian Pacific Railway Company, a Canadian corporation, and alleged as follows: That the defendant was a common carrier, and that plaintiff in the Dominion of Canada delivered to it certain carloads of cattle which the defendant agreed to transport safely to Chicago, and that it had failed to transport and deliver them safely as agreed upon. The defendant answered by a special plea that at the time the cattle were delivered to it, the contract of shipment was made under the provisions of the Canadian law; that one of the provisions of this contract was that the defendant would not be liable for anything done off of the lines of railroad operated by it, and that it had safely delivered the cattle in question to a connecting carrier, and *that none of the services performed by it were within the United States.* Plaintiff demurred to this plea, contending that defendant was liable as the initial carrier under the provisions of the Carmack Amendment, and cited the case of *Galveston, H. & S. A. R. Co.* v. *Woodbury, supra,* in support of his contention that the Canadian carrier was subject to the terms of such amendment. The court reviewed the situation, and said:

"We think the language of section 20 of the Interstate Commerce Act in this respect is not materially different from that employed in section 1, and that there would be much force in plaintiff's argument if it appeared from the record that part of the services agreed to be rendered by the defendant was to be performed in the United States as plaintiff contends. While plaintiff in his declaration alleged that the defendant agreed to transport the cattle from Calgary, Canada, to Chicago, the plea traverses this allegation and sets up that the defendant's agreement was not to transport the cattle to Chicago, but to deliver them to a connecting carrier as agent for plaintiff in Canada; that it did so deliver the cattle

to such carrier and that it did not perform or agree to perform any services in the United States. If plaintiff desired to take issue on the allegations of the plea he should have replied, but, having demurred the allegations were admitted to be true, and, therefore, since it appears from the allegations of the plea that all of the defendant's services were to be performed in Canada, the Interstate Commerce Act cannot apply, because it cannot be given any extraterritorial effect.''

A somewhat similar situation arose in the case of *Fox et al.* v. *Canadian Pacific Ry. Co.*, 260 Ill. App. 482. Certain dressed turkeys were originally delivered to defendant in Canada for transportation to New York; they were next delivered to a connecting Canadian carrier by the defendant, and then by the former to an American carrier which finally delivered them in New York City. It was admitted that no part of the loss sued for occurred while the shipment was in the possession of the defendant, and that all the services performed by it were in the Dominion of Canada. Suit was brought against defendant as the initial carrier, under the Carmack Amendment, and it was also insisted by plaintiff that the contract of carriage was an agreement for a through shipment from Canada to New York City. The bill of lading issued by the Canadian company provided, in substance, as in the present case, ''That said company agrees to carry to its usual place of delivery at destination, if on its road otherwise to deliver to another carrier on the route to said destination,'' and it did so deliver the shipment in good order. The Illinois court held that under the bill of lading the contract was not a through one, and that since it appeared the goods had not been transported by the initial carrier within the United States, the Carmack Amendment did not apply. A somewhat analogous

question has been before the Interstate Commerce Commission repeatedly. These cases, it is true, involved the question of rates; in each of them a Canadian and an American carrier, acting in conjunction, made a through rate from a point in Canada to a point within the United States. It was alleged that the through rate was unreasonable, and in each of the cases it was held that the commission, under the act, was not authorized to prescribe joint through rates from Canada to the United States, nor could it control the charges made by the Canadian carriers for carriage within that country, but that it could and would control the rates which the American lines charged for transportation *within the United States,* whether those rates were separate or part of a joint through rate. *International Nickel Co.* v. *Director General,* 66 I. C. C. 627; *Carey Mfg. Co.* v. *Grand Trunk W. R. Co.,* 36 I. C. C. 203. In *Black Horse Tobacco Co.* v. *Illinois Cent. R. Co.,* 17 I. C. C. 588, the commission said:

"Clearly, we have no authority to establish a rate of transportation in Mexico; nor to order the maintenance of a rate for the future from a point in the United States to a point in Mexico; but we may require the American carriers to cease . . . from continuing to apply a joint through rate."

The Interstate Commerce Act could have provided that in case a shipment originated in a foreign country, the first carrier within the United States should be considered as the initial carrier, and have imposed upon it the liability set forth in the Carmack Amendment, but we think upon both reason and authority that it did not, and, indeed, could not, impose upon the foreign carrier such liability for acts performed wholly without the United States, and our courts could not render a judgment against it for such acts, merely because the foreign carrier happened to have

an agent within the United States upon whom service could be obtained. We hold, therefore, that there was no liability of the Mexican carrier as an initial carrier under the Carmack Amendment on either cause of action. Since the only claim of liability so far as the Illinois car is concerned was based upon the Carmack Amendment, the judgment against the Mexican company cannot be sustained as to that car.

We consider next the cause of action involving the Canadian car. In that case it is contended that there was joint negligence on the part of both the American and Mexican company which caused the damage, the Mexican company by placing ice in the bunkers of the car before the tomatoes were loaded, without the knowledge and consent of plaintiff's assignor, and the American company for failing to remove it and properly to protect the shipment thereafter when ordered by plaintiff.

Defendants contend that the original shipper ordered the ice placed in the bunkers of the car and loaded the tomatoes with full knowledge that it was so placed, while plaintiff argues there is no evidence that the car order, which admittedly requested that the ice be placed in the bunkers, was placed by a duly authorized agent of the shipper, Manuel Sam Lee Produce Company. We cannot agree with plaintiff's theory of the evidence. Without discussing the details, it is sufficient to say we think it shows conclusively that the original shipper's agent ordered the ice and knew it was in the car when it was loaded. Plaintiff frankly admits that if this be true there is no common-law liability of the Mexican company. The trial court, therefore, erred in rendering judgment against the Mexican company on that cause of action.

There remains then for our consideration the question of whether the judgment against the American

company on the first cause of action can be sustained. Being neither the initial nor the delivering carrier, it is not liable under the Carmack Amendment. Its liability, if any, was under the common law as modified by statute.

In determining whether this liability existed, we think best to consider first the contention of defendant that the action was barred by the statute of limitations. The suit was brought in Arizona, and since the statutes of limitations of the *lex fori* generally govern, that of Arizona would prevail, for the Interstate Commerce Act and its various amendments, although they regulate the time in which a carrier may by contract require the notice of loss to be given or suit to be brought, do not affect the ordinary statutes of limitations of the various states in which the action may be commenced. *Louisiana & Western R. Co.* v. *Gardiner*, 273 U. S. 280, 281, 47 Sup. Ct. 386, 71 L. Ed. 644. But the question arises as to what particular statute applies. Plaintiff contends that his action sounds in contract and not in tort, and is governed by the provisions of subdivision 3, section 2061, Revised Code of 1928, which in so far as is material reads as follows:

"*Four year limitation.* There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, the following actions: . . . 3. Upon a judgment or decree of any court rendered without this state, or upon an instrument in writing executed without this state."

Defendant, on the other hand, claims that it is a tort action and therefore falls under the provisions of subdivision 2, section 2059, Revised Code of 1928, which is in the following language:

"*Two year limitation.* There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, the

following actions, for: . . . 2. Trespass for injury done to the estate or the property of another.''

The difference is vital, for if the action is *ex delicto,* it is barred by our statute, but if it is *ex contractu,* it is not. The determination of the nature of the action involves a brief review of the law respecting the responsibility of carriers and the actions which may be brought to recover on such responsibility. Under the common law, the obligation of a common carrier was long supposed to rest entirely upon a public duty imposed by the law as a matter of public policy, which was an obligation to carry safely without excuse nor exception, save for such losses as might be occasioned by the act of God or the public enemy. The idea of contract or the obligations resulting from it were never associated with the question of a carrier's responsibility. Actions for a violation of this obligation were therefore necessarily *ex delicto* and not *ex contractu.* About 1750, however, in the case of *Dale* v. *Hall,* 1 Wilson, 281, there was an innovation upon this doctrine, the court holding, in substance, that there was a contract, express or implied, which created the relation of shipper and carrier, and that a shipper could sue either upon his contract in *assumpsit,* or on the case for the breach of a public duty. Hutchison on Carriers, 3d ed., vol. 3, 1569 et seq; Angell on Carriers, par. 422; *Spence* v. *Norfolk & Western R. Co.* 92 Va. 102, 22 S. E. 815, 29 L. R. A. 578. From that time on, actions were based sometimes on one and sometimes on the other theory. There are still, however, well-recognized differences existing between an action *ex contractu* and that *ex delicto,* which are important in determining whether the one or the other should be brought. For example, if there is any doubt as to who should be made defendants, the action on the case is pref-

erable because such an action is several and not joint. Further, it is not necessary to state the circumstances with as much certainty as in an action in *assumpsit*. On the other hand, since the action *ex contractu* generally carries with it a longer period of limitations than does that *ex delicto*, it may be, as in the present case, of great importance that it be based on contract. It is frequently, however, very difficult to determine to which class a complaint belongs. In such cases of doubt the general rule for this, as well as other actions where the question becomes important, is set forth by us in *Andersen* v. *Thude*, 42 Ariz. 271, 25 Pac. (2d) 272, 273, as follows:

"It is the rule that if the complaint may be construed either as one in tort or one on contract, that it will be presumed to be the latter. *Consolidated Flour Mills Co.* v. *Muegge*, 127 Okl. 295, 260 Pac. 745; *Nathan* v. *Locke*, 108 Cal. App. 158, 287 Pac. 550, 291 Pac. 286. And while a defense raising the statute of limitation is recognized, it is never favored by the courts, and if there is doubt as to which of two statutes applies, the longest period is generally used. *St. L., I. M. & S. Ry. Co.* v. *Sweet*, 63 Ark. 563, 40 S. W. 463; *Hughes* v. *Reed*, (C. C. A.) 46 Fed. (2d) 435; *Matthys* v. *Donelson*, 179 Iowa 1111, 160 N. W. 944; *Trousdale* v. *Amerman*, 124 Kan. 614, 261 Pac. 826; 1 C. J. 1015."

Let us then examine the complaint to determine whether it appears clearly that it is *ex delicto*, or whether the question is doubtful. Plaintiff apparently had some doubts himself as to which form of action should be brought, for his complaint, in paragraph 5, very carefully alleges an agreement, upon consideration, to "safely, securely, expeditiously and with due care" carry the tomatoes to their destination, which clearly sets up a contractual obligation. On the other hand, in paragraph 7 he claims that the defendants "negligently caused the bunkers in the

car into which the said tomatoes were loaded, to be filled with ice and permitted said ice to remain in the bunkers of the said car while the same were in the process of being shipped to their point of destination; that upon being advised that ice had been placed in the bunkers of said car, plaintiff instructed defendants to remove said ice at the first available point, but defendants wholly failed and neglected to remove the same, thereby causing said tomatoes to chill and freeze," which is obviously an allegation of an affirmative misfeasance and later a negative nonfeasance, two things which are ordinarily presumed to give rise to an action *ex delicto*. Nor did plaintiff see fit to set forth either all or part of the contract on which he claims to rely *in haec verba*. The only contract which appears in the evidence is the bill of lading issued by the Mexican company, under the terms of which the American company accepted the Canadian car for transportation. We have examined this document carefully and nowhere therein does there appear any specific agreement on the part of either defendant to remove ice from the car. The sole theory upon which it could be maintained that plaintiff has proved a contractual obligation which was violated by the American company is that the contract impliedly contained the provision that the defendants would safely carry and deliver the goods in question, and that they had failed to do so. We have been unable to find any cases precisely in point or that even approach reasonably to the situation involved in the present action, and we feel that the question is one of considerable doubt. It does appear, however, from a number of adjudicated cases, that if the action is, as a matter of fact, on contract, the mere fact that the contract was breached through the negligence of the defendants does not in and of itself change the action into one in tort. Since the

declaration was on contract, it is not sufficient that plaintiff should prove merely common-law liability; he must prove such liability as is set forth in or reasonably implied by the terms of the contract and subject to such exemptions from liability as may be legally placed therein. Among these exemptions are found the following:

"The Company will not be responsible for the loss, theft, destruction or damage, total or partial, of the shipment subject to transportation on trains or at stations, whether these originate from unforeseen causes or Acts of God, or from results of armed forces or persons not in the employ of the Company."

It was, therefore, not sufficient for the plaintiff merely to show that the goods were received by the American company in good condition and were delivered to the next connecting carrier in bad condition, but it must have appeared affirmatively that if they were so delivered the damage was caused by something for which the American company was responsible. Plaintiff recognized this, for he alleged that the American company negligently failed to withdraw the ice from the bunkers of the car at the request of plaintiff, and that by such failure the tomatoes were chilled and frozen. We think that following *Andersen* v. *Thude, supra,* we should hold the complaint sets up an action on a contract which, in effect, limited defendant's responsibility to the acts of its own agents or employees. It is admitted that on December 18th, shortly after the Canadian car had left Nogales, Arizona, for its destination, and while it was in the possession of the American company, plaintiff delivered to the latter an order to withdraw the ice at the first available point, and guaranteed the expenses of such withdrawal. Upon receipt of such order, however, defendant's agent informed plaintiff that the traffic regulations did not

allow the ice to be taken out before the first point of entry within heater territory. Plaintiff thereupon changed his order, requesting that the ice be pulled, and car placed under carrier's protective service at the first point in heater territory. Heater territory was not reached by the car until it arrived at Jonesboro, Arkansas, and was in the hands of the St. Louis & Southwestern Railroad Company. If it were not permissible, under the regulations of the Interstate Commerce Commission, to take the ice from the car until it had reached heater territory and was in the custody of another connecting carrier, obviously the American company could not be blamed for not withdrawing it, nor for any damages resulting from its failure to do so. If, on the other hand, under the regulations it was permitted to withdraw the ice while the car was in its custody, since plaintiff had notified it to do so at the first point available and had guaranteed the expenses thereof, we think a failure to do this would justify a jury in returning a verdict against the American company in case the evidence showed the shipment was damaged, not by the original placing of the ice in the bunkers, but by the failure to withdraw it between El Paso and the place where the car left the American company's lines. We consider, therefore, whether or not the regulations of the Interstate Commerce Commission did deny the American company the right to withdraw the ice from the car when requested by plaintiff. It appears from the evidence that fresh fruit and vegetables are cared for while being carried on various railroads in the south and west in at least two manners, one of which is known as "Standard Ventilation," and the other as "Carrier's Protective Service against Cold." The car apparently left El Paso under what is known as standard ventilation to the Kansas state line, with an order for carrier's

protective service beyond. This service involves the installation of heaters in a car. Since only certain portions of the country normally require heaters, and since it would be unreasonable to ask carriers to have heaters available at all portions of the lines, the regulations of the Interstate Commerce Commission provide for certain points where so-called heater territory shall begin, and that when cars started from the southern part of the country under refrigeration, upon receipt of reasonable notice the carriers will substitute carrier's protective service upon reaching the heater territory. Under this regulation, it is plain that a shipper may not demand carrier's protective service until his shipment reaches heater territory, and any damage caused by failure to furnish such service before that territory is reached will not be considered as negligence on the part of the carrier. It may even be that not only the carrier cannot be *compelled* to furnish such service, but will not be *permitted* to furnish such service except at the points mentioned. But the mere withdrawal of ice from the bunkers of a car does not constitute carrier's protective service, and we have been unable to find anything in the rules of the Interstate Commerce Commission which forbids a carrier from withdrawing ice from a car at any time or place upon its line, if it desires to do so. The question then is, whether the refusal to withdraw the ice was negligence of such a nature, if damage resulted therefrom, that the American company would be liable. Negligence may be defined as the doing of something which a party is under a legal obligation not to do, or the failure to do something which he is under a legal obligation to do. As to whether any particular act constitutes negligence is a mixed question of law for the court, and fact for the jury. We are of the opinion that when a carrier has goods in transit under a contract

to convey safely, that if it knows that the doing of any particular act is necessary for the safety of the goods and that such act may be performed by it without imposing upon it any burden for which it is not fully compensated, the failure to protect the shipment under these circumstances would, as a matter of law, constitute negligence. If, therefore, it should appear affirmatively from the evidence that the American company could have removed the ice from the bunkers when requested on December 18th to do so by plaintiff, without any uncompensated burden to itself, and that the failure to do so was a proximate cause of damage to the shipment of tomatoes in the Canadian car, it would be liable to plaintiff for the amount of such damages.

We consider next the question of the statute of limitations. It is urged by defendant that (a) because of the failure to notify either it or the Mexican company of the alleged damages within thirty days from the time of the delivery of the goods in Canada, as required by the bill of lading issued by the Mexican company, plaintiff had lost his right to bring action against either company. It is the general rule of law that a carrier may require notice of claim of loss to be given within a fixed time, and if it is not so given, its liability will cease. Such provisions contained in contracts of carriers are usually upheld by the court when the time and manner of notice prescribed therein is reasonable. 4 R. C. L. 794, and note; 10 C. J. 328, and note. But the right to make such contracts may be limited by statutory law, and if such be the case, a regulation in contravention of the statute is void. By the Act of March 4, 1915 (49 U. S. C. A., § 20 (11) note), the minimum period which can be fixed by regulation for giving notice of claims for damages to interstate shipments is ninety days. The bill of lading in this case fixes it

at thirty days. It is not necessary for us to determine whether, as contended by plaintiff, this requirement was merely directory and not mandatory, nor whether it would be considered as reasonable as applied to the Mexican company, as we have held it is not liable on either cause of action. So far as the American company is concerned, we are of the opinion that the regulation is invalid as in violation of the federal act last cited. While a federal statute cannot regulate acts of the Mexican corporation, performed within the Republic of Mexico, we think that when the act so performed is one which is to be carried out partly within the United States, it may require that portion of the act done therein to conform to the federal statute, and may impose a liability upon the American carrier under the terms of the federal statute, rather than the Mexican law. We hold, therefore, that the thirty-day period of notice found in the bill of lading does not and cannot apply to that portion of the transportation carried on in the United States, and is not a bar to plaintiff's action.

The last question is whether or not the evidence supports the verdict and judgment against the American company. We have examined the reporter's transcript and exhibits in the case, and while there is a conflict in the inferences which might be drawn from them, yet we cannot say affirmatively that the jury was not justified in finding therefrom (a) that the tomatoes in question were damaged when they arrived in Canada; (b) that one of the proximate causes of such damage was the failure of the American company to withdraw the ice from the car when directed to do so by the plaintiff. It is true that other triers of fact might have drawn different inferences, but this is a matter which we may not consider. The amount of the damages found, however, is not sustained by the record. The only evidence

on this point is that of the witness Fiske. His testimony as to the damages is as follows:

"Q. State whether or not you were familiar with the market price of tomatoes grown in Mexico, in Ottawa, Canada, on December 27, 1930? A. The proper market price for these tomatoes in good condition should have been $3.25 and $3.50. This car was sold at $2.75 plus 30% duty, but reduced to $1.25 upon arrival on account of condition of the tomatoes."

"Q. If you have stated that you were familiar with the market value of Mexican tomatoes on s~ch date, and if you have stated that the tomatoes in car PFE 51969 have been damaged enroute, please state how much, in your opinion, said damage would lessen the market value of said tomatoes at said time and place. A. The damage decreased the price per case from $2.75 to $1.25, which is $1.50 less."

This is a categorical statement that the goods were sold before delivery at $2.75 per lug, but that on arrival their market value was only $1.25 per lug, due to their damaged condition, or a loss of $1.50 per lug. Under such circumstances, what is the measure of damages? Plaintiff contends it is the difference between the market price had the tomatoes arrived in good condition and their market value as damaged, or between $3.50 and $1.25 per lug. Had the goods been delivered in Canada for sale on the open market, this would have been true. But they were sold before arrival for $2.75 per lug, and that is all plaintiff would have received for them had they arrived in good shape. His damage was the difference between what he would have received and what he did receive, or $1.50 per lug, being $945 for the car. The verdict was therefore excessive in the sum of $489.35.

Since the only error is in the amount of the verdict, and since the only evidence on this point shows that the verdict may be corrected by a mere mathematical

computation, we think it unnecessary to require a new trial, but shall modify the judgment under the authority of section 3681, Revised Code of 1928.

There are other assignments of error which we have considered, but in view of what we have said, we think it unnecessary to discuss them.

For the foregoing reasons, the judgment in favor of plaintiff and against the Southern Pacific Railroad Company of Mexico, a corporation, is reversed and the cause remanded as to it, with instructions to enter judgment in its favor on both causes of action, and the judgment in favor of plaintiff and against Southern Pacific Company, a corporation, on the first cause of action, is modified to read $945 instead of $1,434.35, and, as so modified, is affirmed.

McALISTER and ROSS, JJ., concur.