RAILWAY EXPRESS AGENCY, INC. *v.* H. ROUW COMPANY.

4-5367                                        127 S. W. 2d 251

Opinion delivered April 3, 1939.

Warner & Warner and Paul E. Gutensohn, for appellant.

Howell & Howell, for appellee.

HOLT, J. This action was commenced by the appellee against appellant in the Crawford circuit court on October 18, 1937, to recover $2,957.96 alleged damages on ten separate shipments of strawberries in carload lots. These cars were shipped from Judsonia, Arkansas, to Pittsburg, Pennsylvania; Judsonia, Arkansas, to Buffalo, New York; McRae, Arkansas, to Cincinnati, Ohio; Bald Knob, Arkansas, to Denver, Colorado; Bald Knob, Arkansas, to Buffalo, New York; Judsonia, Arkansas, to Buffalo, New York; Russell, Arkansas, to Cleveland, Ohio; Judsonia, Arkansas, to Cleveland, Ohio; Exeter, Missouri, to Cleveland, Ohio; Ward, Arkansas, to Syracuse, New York. All of these shipments were made during May of 1936. Appellee recovered a verdict in the sum of $2,957.96, the total sum sued for.

The complaint contained ten separate causes joined in separate counts. The allegations in each count are identical except the date of shipment, car number, origin of shipment, destination, and amount of damage alleged. It will be necessary, therefore, to copy the material allegations in the first count of the complaint only, which are: That appellant "then and there received and accepted said strawberries for transportation and issued and delivered to the appellee its original express receipt contract, and for a valuable consideration thereinafter to be paid it agreed to carry and transport said strawberries under the provisions of said contract and its duty as a common carrier of freight and merchandise . . ." Copy of express receipt contract is hereto attached marked Exhibit "A" and made a part of this complaint. Appellee further alleges that the appellant violated its express receipt contract, and also its duty to the appellee as a common carrier by delivering the said strawberries at destination in a soft, wet, rotten and otherwise deteriorated condition, etc.

Thereafter on April 4, 1938, appellant filed its demurrer and answer. The demurrer was overruled. Appellant specifically denied each and every material allegation in the complaint, and pleaded specially that by the terms of the shipping contract it was provided that, unless caused in whole or in part by its own negligence or that of its agents, appellant should not be liable for loss, damage or delay caused by the act or default of the shipper or owner, or the nature of the property, or the inherent vice therein, or improper or insufficient packing, securing, or addressing, or the act of God; that if any loss, damage, or delay occurred in said shipments, or either of them, which appellant denied, it occurred while said cars and each of them were stopped and held in transit or after reaching destination upon request of the shipper or owner, or resulted from one of the excepted causes set forth in said shipping contract, and each of them; that appellant was not an insurer of the safe transportation of said perishable shipments respectively, and that it performed its full duty under the

terms and provisions of said respective contracts of shipment.

The evidence on these ten different shipments is so voluminous, the record containing some 2,500 pages, that it cannot be set out within the compass of this opinion; however, we have carefully considered it and shall set out that which we deem controlling as follows:

The uniform express receipt contract referred to in the complaint and introduced in evidence contains the following provisions: "Paragraph 1. The provisions of this receipt shall inure to the benefit of and be binding upon the consignor, the consignee and all carriers handling this shipment and shall apply to any reconsignment, or return thereof . . . Paragraph 4. Unless in whole or in part by its own negligence, or that of its agents, the company shall not be liable for loss, damage or delay caused by: (a) The act or default of the shipper or owner. (b) The nature of the property, or defect or inherent vice therein. (c) Improper or insufficient packing, securing, or addressing." Paragraph 18 from Classification 24, Packing Requirements, provides: "All shipments must be so prepared or packed as to insure safe transportation with ordinary care on the part of the express company." Section 23 of Classification 24, Refrigeration—Carload Shipments of Perishable Commodities, provided in substance that the express company has arranged for a limited number of refrigerator cars, and, to the extent available, these cars will be furnished on application of shippers; that cars will be handled only by trains designated by the railroad companies; that consignor is required to deliver to express agent written memorandum of load in car, commodity, weight, name of consignee, destination, and any such operation instructions as requesting ice bunkers to be left open, proportion of salt to ice when car re-iced, loading and unloading in transit, etc. That refrigeration being a separate and distinct service of transportation, and not included in express rate, cost of ice and salt must be assumed by owner in addition to charge for transportation.

The record further reflects that the express refrigerator cars used in nine of these shipments were first iced to bunker capacity, from 12,000 to 14,000 pounds of ice being placed in each car, by appellant in North Little Rock, Arkansas, and they were then delivered at the points of origin of the shipments in either Judsonia, McRae, Bald Knob, Russell, Rogers or Ward, Arkansas. In count IX the initial icing to bunker capacity of 13,900 pounds took place at Rogers, Arkansas, and the car then delivered to Exeter, Missouri, for loading by the shipper. Each one of these cars was re-iced to capacity at these shipping points, the cars thoroughly inspected, accepted by the agent, or agents, of the shipper and in each instance was loaded by and under the supervision of appellee, the shipper. When the berries were loaded into each of these cars for shipment they appeared to be in good condition. At the time each of these cars started from the original shipping point their final destination was unknown. In most instances the consignee was the shipper, appellee. These shipments either went first to St. Louis, Missouri, to what is known as the Eastern Gateway, or to Kansas City, Missouri, the Western Gateway, where diversion orders were given by the shipper.

Delays in the movement of nine of these shipments of from three to ninety hours were caused solely by the shipper in giving diversion orders to appellant of the various cars. In one of the shipments, wherein a delay of approximately thirty hours occurred, six hours of this delay, the evidence shows, was the fault of appellant in changing car wheels in St. Louis.

The record further reflects that a sufficient number of icing stations was provided by appellant along the line of each shipment, and that all of these cars were re-iced to bunker capacity at each of these stations, that the temperature inside these cars for the safe transportation of the berries might range from 49 degrees at the top to 42 degrees at the bottom of each car, and that this temperature was maintained in each one of these shipments.

The commodity temperature at destination of car in Count I was 44 over 43½ (meaning 44 degrees at the top

and 43½ degrees at the bottom); in Count II 47 over 42; in Count III 45 over 41 at Cincinnati and 42 over 40 at Louisville; in Count IV 48 over 44 at Kansas City and 45 over 41 at Denver; in Count V by consignees 46 over 42; in Count VI on joint inspection 47 over 40, but by appellant's employee 44 over 40; in Count VII 46 over 43 and by consignee two days after arrival 44 over 40; in Count VIII 42 over 38; in Count IX 43 over 40, and by consignee's inspection 42 over 38; in Count X by appellant's agent on arrival 42 over 38 and twelve hours after arrival by a R.P.I.A. inspector 49 over 41.

The record further discloses that consignees were promptly notified of arrival of the cars at destinations by appellant, and that unloading began promptly; that at destination the berries in the car in Count I showed disease of 3 to 10 per cent. gray mold; in Count II a tan rot average 8 per cent.; in Count III 0 to 4 per cent. gray mold at Louisville and 3 to 10 per cent. overripe at Cincinnati; in Count IV less than 1 per cent. decay at Kansas City; at Denver one crate out of 32, 30 per cent. gray mold, other good, and 3 to 20 per cent. pale, sandy, bird-pecked; in Count V evidence shows the berries were not good quality and 1 to 2 per cent. leather rot, 4½ per cent. botrytis; in Count VI average 2.7 per cent. tan rot, 15 per cent. white shoulders or average 3 per cent. defects; in Count VII most crates 1 to 3 per cent. leather rot in all stages; in Count VIII 4 to 6 per cent. leather rot, early stages, gray mold, botrytis, poor quality; in Count IX 1 to 3 per cent. leather rot, average 8 per cent. ripe and soft; in Count X 1 per cent. cottony botrytis, 2 to 3 per cent. bruised, and 10 to 15 per cent. surface bruised by dividers.

There is evidence that the diseased condition of the berries at their destination was due to their inherent weakness, field disease, and was present in the berries, though not observable when they were gathered from the fields; that these diseases would develop under the temperatures in which the berries were shipped and the only way to prevent such development would be to freeze the berries.

A Mr. Cole, a resident of Van Buren, Arkansas, who has had twenty odd years experience in buying and shipping strawberries, testified that, in his opinion, berries in question in each of these shipments could not have been carried safely above a temperature of 43 degrees, that they would break down at a temperature of 45 degrees. He had no personal knowledge of any of these shipments, was not present when they were loaded, knew nothing about the cars in which they were shipped, and did not claim to possess scientific knowledge, his evidence being based on his experience.

The refrigerator cars used were of approved type and construction. Appellee's witness, Robinson, kept a record of his inspections at the loading points, upon which he relied. These were introduced in evidence as exhibits, and each one stated "if car equipment is defective in anyway (examine close) notify railway of damage in writing." None of his reports show a defect of any kind in the cars or equipment. The cars were inspected at each re-icing station, and the berries appeared to be in good condition at these points. Diversion orders were promptly effected by appellant when received in every instance except in one instance of a six-hour delay in St. Louis for change of car wheels. In every instance, the ice in each car was found to be in good order and sufficient in quantity upon arrival at destination, and the temperature inside the cars adequate.

On this state of the record, at the out-set, appellant earnestly insists that appellee, in each of the ten counts in its complaint, has elected to base any right to recover damages on contract (*ex contractu*) and not in tort (*ex delicto*) and, therefore, since each action was based on contract, appellant was exempted from liability due to the specified causes set forth in paragraph 4 of the express receipt contract, *supra,* and, therefore, the burden rested on appellee to show affirmatively that any loss or damage was either not caused by any act within the exceptions in paragraph 4, or that it was caused by appellant's negligence in fact.

We are of the opinion that the appellant is correct in this contention. While it is true that appellee had the choice of bringing his action on contract or in tort, he must make an election, and in determining this we must gather his intention from the four corners of his complaint, or from a construction of the allegations set out therein. In the instant case it seems to be clear that appellee based his suit on contract. The trial court adopted this view as evidenced by certain instructions which it gave.

Instruction 13 contained this provision: ". . . the plaintiff has based its right to recover for each of said shipments upon the alleged violation by defendant of an express contract of shipment covering each car of berries. The right of plaintiff to recover herein is governed by the respective shipping contracts." And in instruction 15, the court said in substance that it was not sufficient for appellee to prove merely that the berries were delivered to appellant in good condition and delivered by it in damaged condition "but the burden rests upon plaintiff to prove that the defendant is liable according to the terms and provisions of said shipping contracts . . ."

In 1 C. J. S., § 49, p. 1118, the rule is stated as follows: "If the complaint shows that it is based upon the contract of shipment, the action is in contract, provided, it has sometimes been stated, the allegations in regard to the agreement include an averment of consideration, and its character as such is not changed or affected by the fact that there are also allegations of negligence; but if it appears that the complaint is based upon the breach of legal duty as distinguished from the contractual duty, the action is in tort, even though the complaint sets forth the contract of shipment, which is ordinarily treated as matter of inducement or explanation."

In a comparatively recent case, that of *Southern Pacific R. Co.* v. *Gonzalez,* 48 Ariz. 260, 61 Pac. 2d 377, 106 A. L. R. 1012, the principles which we think control here are set forth in a somewhat exhaustive opinion, which reviews the authorities from early times. In this case the

court held that the action to recover damages to a shipment of tomatoes was based on contract, although negligence was alleged and in its opinion said: ''Plaintiff contends that his action sounds in contract and not in tort . . . . Under the common law, the obligation of a common carrier was long supposed to rest entirely upon a public duty imposed by law as a matter of public policy, which was an obligation to carry safely without excuse or exception, save for such losses as might be occasioned by the act of God or the public enemy. The idea of contract or the obligations resulting from it were never associated with the question of a carrier's responsibility. Actions for a violation of this obligation were, therefore, necessarily *ex delicto* and not *ex contractu.*

''About 1750, however, in the case of *Dale* v. *Hall,* 1 Wils. 281, there was an innovation upon this doctrine, the court holding, in substance, that there was a contract, express or implied, which created the relation of shipper and carrier, and that a shipper could sue either upon his contract in assumpsit, or on the case for the breach of a public duty. Hutchinson on Carr., 3d ed., vol. 3, 1569, *et seq.;* Angell on Carr., par. 422; *Spence* v. *Norfolk & Western R. Co.,* 92 Va. 102, 22 S. E. 815, 29 L. R. A. 578. From that time on, actions were based sometimes on one and sometimes on the other theory. There are still, however, well-recognized differences existing between an action *ex contractu* and that of *ex delicto,* which are important in determining whether the one or the other should be brought . . . It is frequently, however, very difficult to determine to which class a complaint belongs. In such cases of doubt, the general rule for this, as well as other actions where the question becomes important, is set forth by us in *Anderson* v. *Thude,* 42 Ariz. 271, 25 P. 2d 272, as follows: 'It is the rule that if the complaint may be construed either as one in tort or one on contract, it will be presumed to be the latter. *Consolidated Flour Mills Co.* v. *Muegge,* 127 Okla. 295, 260 P. 745; *Nathan* v. *Locke,* 108 Cal. App. 158, 287 P. 550, 291 P. 286' . . .

"Plaintiff apparently had some doubts himself as to which form of action should be brought, for his complaint, in paragraph 5, very carefully alleges an agreement, upon consideration, to 'safely, securely, expeditiously and with due care' carry the tomatoes to their destination, which clearly sets up a contractual obligation. On the other hand, in paragraph 7, he claims that the defendants 'negligently caused the bunkers in the car into which the said tomatoes were loaded to be filled with ice,' etc. . . . Nor did plaintiff see fit to set forth either all or part of the contract on which he claims to rely in *haec verba*. The only contract which appears in the evidence is the bill of lading issued by the Mexican company, under the terms of which the American company accepted the Canadian car for transportation." See, also, *Am. Ex. Co.* v. *Lankford,* 1 Ind. T. 233, 39 S. W. 817.

In the instant case appellee alleged and proved the shipping contract entered into and thereby committed itself to an action on contract. Since the action was based on contract it exempted appellant from liability due to the specified causes set forth in paragraph 4, *supra.* The burden rested on appellee to show affirmatively that the loss resulted from a cause for which appellant was responsible.

In 9 Am. Jur., § 835, p. 942, the author says: "It has also been held that where the complaint itself discloses that the shipment was carried under a special contract which exempts the carrier from liability for loss due to specified causes, the burden rests upon the plaintiff to show affirmatively that the loss resulted from a cause for which the carrier is responsible."

It was, therefore, not sufficient merely to show that these berries, in each of these shipments, were delivered to appellant at the point of origin in good condition and delivered at destination in a damaged condition. That would only prove common law liability which was not alleged and was not sufficient under the shipping contracts. We hold that appellee has failed to discharge the burden imposed upon it by substantial testi-

mony and, therefore, is not entitled to recover on any of ten shipments involved in this case. To entitle appellee to recover it was required to prove liability as set forth in, or reasonably implied by the terms of the contract and subject to all exemptions stated therein.

On the evidence before us in this record as relating to all of these ten shipments, even if we test appellee's right to recover, on appellant's common law liability, which only requires appellee to show that it delivered the berries to appellant in a good condition, and that they were delivered at destination points in a damaged condition, in order to establish a *prima facie* case of negligence against appellant, still we hold that appellant has successfully overcome this *prima facie* case made by appellee, and that the evidence falls far short of being of that substantial nature required by the decisions of this court to afford a recovery.

In the instant case, appellant undertook to transport for appellee strawberries, a perishable commodity, and the rule is well settled that, in so doing, appellant was not an insurer, but was required to use ordinary care in the transporting and in its handling of the berries and in the furnishing of refrigerator cars for that purpose. In 13 C. J. S., § 79, p. 152, it is stated: "With respect to perishable goods which themselves contain the elements of destruction governing their loss or deterioration, the carrier is not an insurer, and is no more liable for destruction or injury resulting solely from the inherent infirmity in the goods than for loss entailed solely by an act of God or of the public enemy, or by the carelessness of the shipper . . . The measure of the carrier's duty is to exercise reasonable care and diligence to protect the goods from loss or injury while in its custody, taking into consideration the character of the commodity, the condition of the weather, and the time necessary to complete the transportation, and it is generally said that the carrier is liable for only such deterioration as is attributable to its negligence."

The same principle is declared in 4 R. C. L., § 375, p. 919: "The methods of handling and transporting fruit

are well understood, and carriers accept freight for transportation with the understanding and expectation that they will observe proper care, as that is understood by the shipper and carrier of such articles. Carriers are not insurers in such cases; but each one is charged with the duty of exercising ordinary care to protect fruit from injury while it is in its charge, and this duty requires the carrier to use such care in order to prevent the fruit from decaying, as well as from being damaged by other means."

The shipper assumed the responsibility of loading, and did load, each of these shipments at points of origin. In 9 Am. Jur., § 725, at page 866, it is said: "When a shipper assumes the responsibility of loading a car and seeing that it is properly prepared for the transportation of the particular article which he is loading, the general rule seems to be that he assumes responsibility for all defects in package and loading which are necessarily invisible to the agent of the carrier who accepts the freight or which he cannot discern by ordinary observation or such inspection as he can readily make."

See, also, *So. Pac. Co.* v. *Itule* (Ariz.), 74 Pac. 2d, 38, 115 A. L. R. 1268, wherein the court said:

"We think the fairer and more logical rule is that in cases of the shipment of perishable fruits and vegetables, when the carrier shows affirmatively that it handled them in the method requested by the shipper, and that it exercised reasonable care to prevent any damage from any cause not necessarily involved in the method of transportation so chose, that it has satisfied the requirements of the law in regard to the quantum of proof required to establish a defense to the action." We think appellant performed the duty required of it in transporting each one of these shipments and that there is no substantial evidence in this record to the contrary.

In *Ry. Ex. Co.* v. *H. Rouw Co.,* 185 Ark. 526, 48 S. W. 2d 220, the court held: "A carrier which holds itself out as proposing to provide means of preserving perishable goods must exercise ordinary care in adopting means of transportation and furnishing such equipment." In

*Ry. Ex. Co.* v. *H. Rouw Co.*, 184 Ark. 482, 42 S. W. 2d 261, this court held (quoting syllabus): ''The duty of a carrier transporting strawberries is to exercise ordinary care to ice and re-ice the car properly. . . . The duty of a carrier transporting strawberries is to exercise ordinary care merely in furnishing shipping facilities.''

Therefore, testing the liability of appellant on each of these shipments for loss, by negligence as at common law, we think that each of the ten counts in the instant case is ruled by the recent case of *Ry. Ex. Agency* v. *S. L. Robinson & Co.*, 184 Ark. 660, 43 S. W. 2d 543, wherein the plaintiff was allowed to amend his complaint and rely solely for negligence upon the liability of the carrier as at common law. The evidence in that case showed that the berries were received in good condition and delivered at destination in a poor condition. This court in that case said: ''Counsel for appellees claim that they amended their complaint and relied solely on liability for loss by negligence of the carrier as at common law. Inasmuch as we have reached the conclusion that the carrier has overcome the *prima facie* case made by the shipper, we shall treat the complaint as amended as contended for by appellees. . . .

''The carrier did not content itself with introducing witnesses as to the general condition of the shipment of strawberries while in its hands, but introduced all persons employed by it who had part in the different transactions during transit. We do not mean that all the operatives of the train were introduced as witnesses, but we do mean that the carrier followed the shipment step by step from the place of shipment to the place of delivery. It was shown by competent evidence that a refrigerator car of the most approved type was furnished the shipper within which to carry the berries. The condition of the car and its material, both as to its equipment and construction, were detailed by the witnesses. It was shown that the carrier had a sufficient number of stations along the route for re-icing the car and that the car was properly inspected and well iced at all these stations. The evidence shows that the car of strawberries was in

good condition at all these points. The car was diverted by the shipper from Kansas City, Missouri, to Chicago, Illinois. As soon as it arrived at its destination, the consignee was notified. An examination of the berries was made when they arrived at their destination, and they were found to be full ripe and watery. None of the crates were broken or damaged. One inspector testified that the berries contained brown rot which is a disease of berries known as botrytis. This exists from water-soaked berries, causing a dry and leathery rot. Botrytis in these berries originated from the berries getting water-soaked, forming a dry leathery rot. This resulted from the inherent nature and infirmities of the berries. Another inspector testified that brown rot, called botrytis, is an inherent field disease. The condition existed when the berries were loaded, although it might not then be visible. . . .

"The testimony of the witnesses for the appellant was reasonable and consistent in itself, and we think entirely overcame the presumption of negligence in favor of the shipper caused by proof that the berries were received in good condition at the point of shipment, and were in a decayed condition at the time of reaching their destination. . . . It is true that A. H. Welch, a witness for the shipper, testified that the berries were bruised when inspected by him at the place of destination in Chicago. He said that he did not know, however, what caused this; but the explanation given by the witnesses for the carrier explains it. On account of their diseased condition they became soft and watery, and this, in the very nature of things, would cause them to become bruised."

Just as in the Robinson Case, *supra,* appellant in each of the shipments in the instant case followed them step by step from points of origin to their destination and we think there is no substantial evidence in this record showing that appellant failed to exercise that degree of care required of it in its handling of each one of these shipments.

On the whole case, we conclude, therefore, that the trial court erred, at the conclusion of the introduction

of all the evidence in the case, in its refusal to instruct a verdict for the appellant, and since each one of these ten cases seems to have been fully developed, the judgments rendered in each is reversed and each cause of action dismissed.